**Kenneth W. DAVIS, Plaintiff,**

v.

**William F. BOLGER, Defendant.**

**Civ. A. No. 78–1789.**

United States District Court, District of Columbia.

July 29, 1980.

Lawrence S. Lapidus, Washington, D.C., for plaintiff.

Whitney Adams, Asst. U.S. Atty., Washington, D.C., for defendant.

## OPINION AND ORDER

HAROLD H. GREENE, District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*. Three issues are before the Court: (1) whether the evidence sustained allegations of discrimination on account of race, sex, and age because of the failure of the United States Postal Service to promote plaintiff; (2) whether plaintiff's supervisors committed acts of reprisal against him because he filed an equal employment opportunity complaint; and (3) whether plaintiff and his witnesses are entitled to administrative leave for the time of their attendance at the trial. The first two issues involve relatively routine applications of the facts to established law; the third raises a more novel question.

I

Plaintiff is a black male over 40 years of age. He has been employed by the United States Post Office Department and its successor, the U.S. Postal Service, since October, 1966, and he has worked in the position of bulk mail technician at the Washington Bulk Mail Center since July 1975. In late 1976 through 1977, a reorganization of the management structure at the Center led to vacancies in a number of

initial–level supervisory positions in the Mail Processing Division.[1]

Along with thirty–two other candidates, plaintiff applied for placement on a list for consideration for a permanent supervisory position in the Mail Processing Division.[2]

The Manager of the Bulk Mail Center appointed a five–member advisory panel to rate the applicants.[3] The panel submitted to the Manager a supervisory register of fifteen candidates,[4] plaintiff's name not being among them.[5] In September, 1977, when six supervisory positions became available, a second advisory panel, also appointed by the Manager, recommended six persons as best qualified for the positions,[6] and all of these persons were awarded the available promotions.[7]

Under both Title VII and the Age Discrimination in Employment Act, plaintiff has the burden of establishing a prima facie case of discrimination.[8] Once this showing is made, the defendant has the responsibility to prove legitimate, non–discriminatory reasons for the disparate treatment. Should defendant satisfy this burden it then becomes incumbent upon plaintiff to demonstrate that the reasons articulated by defendant were in actuality mere pretexts for discrimination. *McDonnell Douglas Corp. v. Green* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Co. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (Title VII); *Wilson v. Sealtest Foods Divi-*

1. To fill these vacancies temporarily, certain employees were designated to perform supervisory assignments on an acting basis. Plaintiff was detailed to the Mail Processing Division four different times from April through September of 1977, for periods ranging from three days to two weeks, and he there performed the functions of an acting initial level supervisor.

2. Each employee who made application for the position of supervisor, mails PMS 15 was rated by his immediate and his second level supervisors on work performance and potential for supervisory responsibility according to a number of factors. The supervisors assigned a

summary rating for potential and performance, and an overall rating to each applicant of A, B or C (with A being the highest rating and C the lowest). James Strong, one of plaintiff's immediate supervisors at the time he was detailed to Mail Processing as acting supervisor (see note 1 *supra*), gave plaintiff an overall rating of A, but Edward Fish, plaintiff's second level supervisor during that period, while awarding plaintiff an A rating in performance, gave him only a B in supervisory potential, or an overall rating of B.

3. The race, sex, and age makeup of the 33 candidates was as follows:

| Black | White | Female | Male | Over 40 | Under 40 |
|---|---|---|---|---|---|
| 25 (76%) | 8 (24%) | 13 (39%) | 20 (61%) | 8 (24%) | 25 (76%) |

4. The race, sex, and age makeup of the 15 candidates was as follows:

| Black | White | Female | Male | Over 40 | Under 40 |
|---|---|---|---|---|---|
| 10 (67%) | 5 (33%) | 4 (28%) | 11 (72%) | 5 (33%) | 10 (67%) |

5. Plaintiff's relatively low panel rating was presumably influenced by the similar supervisory rating. See note 2 *supra*.

6. The names of two alternates were also forwarded.

7. Of the six, five were black; five were male; and two were over forty. All of the six selectees except for one had received A ratings from both their immediate and second level supervisors; the one exception, who had received a B rating from his immediate supervisor, was black, male, and over forty as is the plaintiff.

8. Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a prima facie case is established for

Title VII purposes by a showing that plaintiff belongs to a protected group, that he applied for and was qualified for the job, that he was rejected, and that after the rejection the employer sought other applicants. The Supreme Court indicated, however, that these specifications may not be strictly applicable in every factual situation. 411 U.S. at 802, 93 S.Ct. at 1824. See *Wilson v. Sealtest Food Division of Kraftco Corp.,* 501 F.2d 84, 86 (5th Cir. 1974), applying similar standards under the Age Discrimination in Employment Act.

*sion of Kraftco Corp.*, 501 F.2d 84 (5th Cir. 1974); *Bishop v. Jelleff Associates*, 398 F.Supp. 579, 593 (D.D.C. 1974) (Age Discrimination Act).

Plaintiff attempted to make his prima facie case through testimony indicating that he is black, male, and over forty, and that others, without these attributes, were placed on the list of candidates eligible for promotion while he was not. As elaborated below, it is doubtful that plaintiff's proof rose to the level required. However, even if it did, it is clear that defendant has satisfied his burden of showing legitimate reasons of business necessity for his personnel actions with respect to plaintiff, and that he has also shown that his reasons are not pretextual.

Aside from proof of membership in the several protected groups and of rejection for promotion, plaintiff's case consisted essentially of a showing that he is a conscientious worker, who is and has been doing his best on the job.[9] This evidence is insufficient to show that plaintiff was improperly denied a supervisory position in light of testimony that, although he is a good worker, he has not been effective as a supervisor. While serving in an acting capacity, he is said to have antagonized his subordinates through his highly rigid disciplinary style, and to have lacked communications skills. Credible evidence to this effect by several individuals[10] was not effectively rebutted.

Plaintiff further contends that he was not selected by the first advisory panel as one of the eligible candidates because one Edward Fish, his second level supervisor, gave him two relatively low ratings. See note 2 *supra*. Fish is alleged to be biased against blacks[11] and prejudiced in favor of women workers.[12] It is difficult to see how these biases, even if they are assumed to exist, affected Fish's evaluation of workers applying for supervisory positions. To be sure, Fish gave plaintiff, a black male, a B rather than an A rating; however, with respect to the other five members of the applicant pool which he rated, he gave A's to two black males, to one white male, and to one black female, and he awarded B's to the other two white males. There was also testimony to the effect that Fish kept plaintiff on as an acting supervisor even when others wanted to terminate plaintiff at that position. Thus, no bias on the part of Fish was proved either against any class or against plaintiff.

In any event, any discriminatory attitude of Fish would be immaterial in the present context, for Fish did not have a decisive voice in the selection or nonselection of plaintiff for a supervisor slot. The real decisions were made by the advisory panels and by the Manager of the Bulk Mail Center; yet none of the individuals on the panels nor the Manager are charged with any discrimination against any of the categories which plaintiff represents.[13]

For these reasons, the Court is unable to conclude that plaintiff has made a prima facie showing of discrimination.

Even if it be assumed, *arguendo*, that such a showing had been made, it would not help plaintiff. Defendants have demonstrated legitimate, non–discriminatory reasons for not promoting plaintiff. The Bulk Mail Center is subject to frequent griev-

---

9. The record contains a number of commendations by Postal Service officials and by postal patrons, and a number of plaintiff's co–workers testified that they thought highly of him and believed that he would be a good supervisor.

10. Testifying to this effect were members of the advisory panel as well as the Manager of the Bulk Mail Center.

11. Several EEO complaints have been filed against Fish; one witness stated that Fish did not interfere when another supervisor segregated people on the line according to race.

12. A former union official testified that Fish was biased in favor of women workers; however, his testimony may largely be discounted due to the lack of credibility evinced by his demeanor and attitude, and his recent dismissal for insubordination.

13. Indeed, the fact that plaintiff received a B rating from Fish is not determinative, since one of the candidates, James Harris, was promoted even though he received a similar rating from one of his supervisors.

ances and EEO complaints,[14] and management was therefore interested in tactful, diplomatic supervisors. In management's view, plaintiff did not meet these qualifications; the other candidates selected, while not without faults, were better qualified in these respects, and the Court finds, based upon all the evidence, that this conclusion represented an appropriate business reason.[15]

## II

Plaintiff next claims that he was the subject of reprisals after he filed his EEO complaint,[16] primarily in that he was denied overtime after he brought his claim. However, a comparison of a six–month period before plaintiff filed his EEO complaint (December 1976–June 1977) with a similar six–month period afterwards (December 1977–June 1978) shows that plaintiff's overtime actually increased substantially,[17] in spite of that fact that during 1978 the general need for overtime at the Bulk Mail Center was reduced. Moreover, plaintiff continued to work overtime at rates far exceeding the average overtime for the general employee force at the Center. In these circumstances, it is impossible to credit plaintiff's assertion that he was subjected to reprisals by being denied overtime.

Plaintiff also states that reprisals were effected against him in that he was no longer detailed to supervisory positions, and by his supervisor's failure to rate him as "excellent" on one aspect of an evaluation form required as part of plaintiff's application for non–postal employment as a security guard. The first of these claims is simply not sustained by the evidence, since plaintiff appeared to continue to receive such assignments as they were available.[18] As for the "excellent" rating, the evidence showed that plaintiff never pursued the matter with his supervisor although he had ample opportunity to do so; no real evidence was offered demonstrating that the supervisor's withholding of the rating was triggered by a retaliatory motive; and the incident in question took place a full year after plaintiff filed his complaint, and the causal link between the two events is therefore extremely weak. See *Bradington v. IBM*, 360 F.Supp. 845, 854–55 (D.Md. 1973), *aff'd without opinion* 492 F.2d 1240 (4th Cir. 1974). Finally, given the frequency of EEO complaints and grievances at the Bulk Mail Center (see note 14 *supra*), it is difficult to understand why plaintiff would have been singled out for retaliatory treatment. The Court finds that plaintiff was not subject to reprisal for having filed an EEO complaint.

## III

Plaintiff has complained that, while the time taken by the Postal Service's witnesses for attendance at trial was covered by administrative leave–that is, they were paid for their time as if they had been at work–plaintiff and his witnesses were forced to take annual leave to cover their court time–that is, they attended the trial on their own time. Defendant argues in rebuttal that this practice is allowed by the Postal Employee and Labor Relations Manual, which is incorporated by reference into

---

**14.** It was testified that some two hundred such complaints are filed annually, and it appears that despite good faith efforts of management to be fair, almost every personnel action generates a complaint of some sort by dissatisfied employees.

**15.** Plaintiff's claim that the justification provided by management is a mere pretext to explain a policy of discrimination may be readily dismissed. It is difficult to see what management's policy of discrimination might be. Of the six persons ultimately selected for supervisor, five were black, five were male, and two were over forty. These results do not indicate any discrimination for which defendant's concerns about plaintiff's lack of supervisory qualifications might have served as a pretext.

**16.** Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), makes it an unlawful employment practice "for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."

**17.** From 330 hours to 475 hours.

**18.** Plaintiff worked at least twenty–one hours in supervisory positions after the complaint was filed.

the collective bargaining agreement between the Postal Service and the American Postal Workers Union. This same practice is also being followed in other federal agencies. See note 37 *infra*.

The government's [19] practice of paying witnesses for the defendants in Title VII cases for their appearance in court but refusing to make similar payment to plaintiffs' witnesses cannot be squared with the Civil Rights Act of 1964 and the Equal Employment Opportunity Act of 1972. Congress enacted Title VII in order "to eliminate, through the utilization of formal and informal remedial procedures, discrimination in employment." [20] The statute was designed to afford to those suffering from discrimination an efficacious remedy, unencumbered by unnecessary difficulties and obstacles. For that reason, it must be, and has been, liberally construed to achieve its objectives. *Barnes v. Costle*, 561 F.2d 983 (D.C. 1977).

In line with this policy, plaintiffs in Title VII actions are provided with significant procedural advantages. Unlike petitioners for review of agency decisions generally, Title VII claimants are entitled to trials *de novo* in federal court; [21] the notice provisions of Title VII have been given "an interpretation animated by the board humanitarian and remedial purposes underlying the Federal proscription of employment discrimination"; [22] principles of standing are interpreted to favor individual plaintiffs; [23] and complex time limitations in Title VII have often been construed in plaintiff's favor so as not to render meaningless the congressional promise of federal protection against employment discrimination. [24]

In fact, certain Title VII provisions are designed even to provide to the Title VII plaintiff with a slight "boost" over his employer-defendant as a means of rectifying the imbalance of strength and resources inherent in their relationship, and of facilitating the redress of injuries caused by discrimination. For example, section 706(f) of the Act, 42 U.S.C. § 2000e–5(f), provides that the court may appoint an attorney for the individual plaintiff and authorize the commencement of the action without the payment of fees, costs, or security. [25] Simi-

---

**19.** For purposes of the present issue, the Postal Service may appropriately be equated with the federal government generally. Title VII was enacted largely to effectuate the guarantees of equal protection provided by the 5th and 14th amendments, and for the purposes of these Amendments, actions of organizations with far less federal or state involvement than the Postal Service has been deemed to be federal or state action by the courts. See *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1970); *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Simkins v. Moses H. Cone Hospital*, 323 F.2d 959 (4th Cir. 1963). With regard to the extent of federal involvement with the Postal Service, see *Nolan v. Woodruff*, 68 F.R.D. 660 (D.C.D.C. 1975) (Postal Service is "delegee of specific constitutional authority from Congress to perform an exclusively governmental function" and for that reason, Postal employees' wages are not subject to garnishment); see also, 39 U.S.C. § 101(a) ("The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States . . . ."); § 202 (nine out of eleven of the Board of Governors of the Postal Service are appointed by the President with the advice and consent of the Senate); § 409(d) (legal representation of the Postal Service provided by the Department of Justice); and see also, 39 C.F.R. § 1.1 *et seq.* The Postal Service and traditional government departments are generally collectively referred to herein as "the government."

**20.** Report of the Committee on the Judiciary, H.Rep. 88–914, 88th Cong., 1st Sess. 26 (1963), U.S.Code Cong. & Admin.News 1964, p. 2401.

**21.** Section 706(f)–(k) of the Act, 42 U.S.C. § 2000e–5(f)–(k); *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976); *Hackley v. Roudebush*, 520 F.2d 108 (D.C. Cir. 1975).

**22.** *Coles v. Penney*, 531 F.2d 609, 616 (D.C. Cir. 1976).

**23.** *Huff v. N. D. Cass Co. of Alabama*, 485 F.2d 710, 714 (5th Cir. 1973).

**24.** *Culpepper v. Reynolds Metals*, 421 F.2d 888, 891 (5th Cir. 1970); but *cf., Mohasco Corp. v. Silver*, —— U.S. ——, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

**25.** The House Report on the Equal Employment Opportunity Act of 1972 stated concerning this section, "[b]y including this provision in the

larly, under the same provision a successful plaintiff is entitled to attorneys' fees, but a "prevailing defendant seeking an attorney's fee does not appear before the court cloaked in a mantle of public interest" and is entitled to such a fee only where the court finds that the proceeding was maintained in bad faith. *United States Steel Corporation v. United States*, 519 F.2d 359, 363–64 (3rd Cir. 1975).

It would directly contradict this general policy to permit the Postal Service, or the government generally,[26] to bring its witnesses into court on a paid status while relegating plaintiffs claiming discrimination to producing their witnesses from the same government agency on their own time.[27]

Nor can such a practice be justified on the theory that it is in the government's interest to pay its employees when they assist it in court but not when they testify for the "other side." In a Title VII lawsuit the plaintiff in a very significant sense is not on the other side. The United States has a substantial interest of its own in the elimination of discrimination on account of race, sex, age, or physical handicap in its ranks–an interest at a minimum sufficient to preclude the creation of artificial obstacles in the path of those whose actions tend to vindicate that interest, whatever their own private motives may be. The penalty

of payless witness days for those who appear on behalf of Title VII plaintiffs is one such obstacle. As Judge Tuttle said, speaking for the Court of Appeals for the Fifth Circuit, in *Culpepper v. Reynolds Metals, supra*, 421 F.2d at 891,

> Title VII of the 1964 Civil Rights Act provides us with a clear mandate from Congress that no longer will the United States tolerate [discrimination in employment]. It is, therefore, the duty of the court to make sure that the Act works.

The statute generally applicable to court leave for witness time for government employees in actions to which the United States is a party is 5 U.S.C. § 6322, which provides in subsection (a) that a government employee is entitled to leave without loss in pay or in leave to which he is otherwise entitled

> during a period of absence with respect to which he is summoned, in connection with a judicial proceeding, by a court . . . to serve . . . other than as provided in subsection (b) . . . as a witness on behalf of any party in connection with any judicial proceeding to the United States . . . is a party.

This statutory provision, though not precisely applicable to postal employees,[28] strongly buttresses the Court's conclusion with respect to plaintiffs' witnesses called

---

bill, the Committee emphasizes that the nature of Title VII actions more often than not pits parties of unequal strength and resources against each other. The complainant, who is usually a member of a disadvantaged class, is opposed by an employer who not infrequently is one of the nation's major producers, and who has at his disposal a vast array of resources and legal talent." Report of the Committee on Education and Labor, H.Rep.No.92–238, 92d Cong., 1st Sess. 12 (1971), U.S.Code Cong. & Admin.News 1972, p. 2148.

**26.** Although only the problem of how the Postal Service compensates its witnesses in Title VII litigation is directly involved in this case, the conclusions reached herein are applicable equally to Title VII litigation involving government agencies generally. The issue of witness compensation to employees of private companies may raise different issues and is not considered herein.

**27.** The mischief that may be produced by this policy is illustrated by an incident which oc-

curred in this case. A witness originally listed as appearing for the plaintiff was subsequently called instead by the defendant. In that capacity, and in conformity with the current Postal Service practice, he was to be given administrative leave for his time on the stand and while waiting to testify. Yet had he testified as plaintiff's witness, he would have had to appear in court either taking annual leave or leave without pay, that is, on his own time. It is not fanciful to speculate that such a difference could color his testimony and that of others similarly situated.

**28.** 5 U.S.C. § 2105. However, the unambiguous legislative intent to treat witnesses for and against the government and governmental agencies on equal terms combined with the anti–discriminatory purpose of Title VII militates in favor of applying the principles embodied by this provision to the case before the Court.

in Title VII actions. It provides on its face for paid leave for a witness summoned "on behalf of any party," obviously not excluding an individual who has brought suit against the government and his witnesses. The legislative history of subsection (a) as amended in 1976 bears out this interpretation.

As originally enacted in 1970, the statute entitled a government employee to court leave, that is, paid leave, for a period of absence "as a witness on behalf of a party other than the United States, the District of Columbia, or a private party." The subsection was amended in 1976 by Public Law 94–310 with a view towards "eliminating inequities" and discrimination between government employees appearing on behalf of the government who are effectively paid for their court time,[29] "and those who are required to take annual leave or leave–without–pay when they appear as witnesses on behalf of a private party in a judicial proceeding to which the United States" is a party. Report of the Committee on the Judiciary, S.Rep.No.94–830, 93d Cong., 2d Sess. 2 (1976), U.S.Code Cong. & Admin.

News 1976, pp. 1207–08. Thus, it seems apparent that the purpose of section 6322(a) as presently constituted is to entitle all government employees summoned to testify at a judicial proceeding to which the United States is a party to paid status while so testifying, whether they are testifying for the government or the party that is the government's opponent.[30]

Construing Title VII of the Civil Rights Act, in conjunction with 5 U.S.C. § 6322 the Court concludes that the government is precluded from denying to a Title VII plaintiff and his witnesses paid court attendance similar to that which it grants to witnesses for the defendants.[31] Any contrary construction of the law would raise serious constitutional problems, and it would offend basic notions of fair play, equal protection,[32] and the even–handedness of the judicial process. And whatever may be the authority of the courts with respect to other matters, they certainly do not lack the authority and responsibility for insuring that basic equal protection principles are not disregarded in the judicial process.[33]

29. Existing law at the time of this provision's passage authorized court leave for an employee of the United States or of the District of Columbia for attending court in a non–official capacity as a witness on behalf of the government. (28 U.S.C. § 1823), but did not provide for court leave for government employees testifying on behalf of state or local governments. Public law 91–563 sought to remedy this gap. Report of the Committee on the Judiciary, S.Rep.No. 91-1371, 91st Cong., 2d Sess. 1–4 (1970), U.S. Code Cong. & Admin.News 1970, pp. 5014, 5016. Provision for government employees testifying on behalf of the United States government was made in 5 U.S.C. § 6322(b) which stated (and remained unchanged by the 1976 amendment) that a government employee performs official duty when "summoned . . to . . . testify or produce official records on behalf of the United States . . . ." Under the law as amended in 1976, court leave is authorized for a government employee testifying on behalf of *any* party in a case to which the government is a party, except as provided in subsection (b). Thus, by virtue of subsection (b) if an employee is called on the federal government's behalf he is considered to be on official duty, making it unnecessary to provide for court leave, while if he is called on any other party's behalf he is entitled to court leave by virtue of subsection (a). There appears to

be no practical distinction between being on court leave and being on official duty in terms of compensation for time as a witness.

30. While this interpretation would indicate that court, or paid, leave is available to witnesses in all action to which the United States is a party, in the instant suit the Court is confronted with the paid leave issue only in a Title VII context in which there are strong extrinsic policy reasons apart from section 6322 for granting such leave to employees testifying on behalf of a plaintiff.

31. Technically, in Title VII cases—as is true here—the defendant is not the United States but one or more government officials. Reading Section 6322 as the government would read it, the witnesses for those defendants would no more be entitled to payment than the witnesses for the plaintiff; yet presently the former are being paid, but not the latter. See note 37 *infra.*

32. See *United States v. Thompson,* 452 F.2d 1333 (D.C. Cir. 1971); *In re Evans,* 452 F.2d 1239 (D.C. Cir. 1971).

33. See, *e. g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Arger-*

The government argues finally (1) that the question of paid court leave must be decided under the Postal Service's collective bargaining agreement with the postal union and is therefore beyond the jurisdiction of the Court, (2) that witnesses who wish to be paid must first file an EEO claim and exhaust their administrative remedies, and (3) that the Equal Employment Opportunity Commission is presently considering this matter and may provide relief. None of these contentions is persuasive.

First. There is no evidence before the Court other than the statement of government's counsel that the matter is addressed in the collective bargaining agreement. The agreement and the sections of the Employment and Labor Relations Manual entered into evidence make no mention of the issue of whether court attendance is to be charged to administrative or annual leave.

■ Second. The witnesses for the plaintiff have been victims of a general policy applied both by the federal government and the Postal Service. This case involves no peculiar factual circumstances and if the witnesses who wished to be paid were to file an EEO claim,[34] this general policy would simply and routinely be applied to them. It is well settled that where recourse to agency procedures would be futile because the agency's position is firm a litigant need not first exhaust his administrative remedies before bringing his case to court. See, e. g., *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 703 (D.C. Cir. 1975).[35]

Third. The EEOC may or may not be considering this matter,[36] but in any event, no one knows when it will make a decision or what that decision will be. Beyond that, whatever the conclusion the EEOC might reach, its decision would not help this plaintiff and his witnesses who appeared before this Court in this proceeding. Should the EEOC or the Office of Personnel Management [37] eventually promulgate govern-

*singer v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). It should be noted that under 28 U.S.C. § 1825, in any case in which the United States is a party, the United States marshal is authorized to pay all fees of witnesses on the certificate of the United States Attorney, regardless of on whose behalf (government or defendant) the witness is testifying.

34. It is not at all clear that witnesses themselves would have administrative remedies under EEO procedures, since they could not allege discrimination of the type prohibited by Title VII against themselves.

35. The Court is also justified in deciding this dispute now, rather than to await the exhaustion of any administrative remedies, under general principles of equity. Courts of equity, "having jurisdiction of the parties to controversies brought before them, . . . will decide all matters in dispute and decree complete relief." *Alexander v. Hillman*, 296 U.S. 222, 241–42, 56 S.Ct. 204, 211, 80 L.Ed. 192 (1935). Where "fundamental statutory rights infused with constitutional ingredients" are at issue, a court of equity which has jurisdiction has the power "to go beyond the remedies set forth in the statute to grant full relief to those in the class protected by Congress." *Green v. Connally*, 330 F.Supp. 1150, 1177 (D.D.C.1971), aff'd, *Cort v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550; see also *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960) (referring to the "historic power of equity to provide complete relief in light of the statutory purposes" of the Fair Labor Standards Act); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946) (suit to enjoin collection of war–time over–ceiling rents). Where, as here, the original claim involves a statutory scheme arising directly out of the constitutional guarantee of equal protection, and the parties and their claim are before the Court, the Court does not lack power in its capacity as a court of equity to grant the necessary relief.

36. The Court was informally advised by counsel for the government that the EEOC may be considering the matter, but it has received no indication of the type of proceeding, if any, pending before that body or its current status.

37. Section (c) of 5 U.S.C. § 6322 provides for the issuance of implementing regulations by OPM. No such regulations have ever been issued. The Federal Personnel Manual issued by the Civil Service Commission and in use by the various federal agencies does not authorize paid leave for plaintiffs' witnesses. See F.P.M., Book 630, Supp. 990–2, pp. 49–50. A letter issued by the Civil Service Commission in 1976 would authorize such leave but although it is now four years old it has never been incorporated into the Federal Personnel Manual itself. See F.P.M. Letter No. 630–25, issued August 20, 1976. As the instant litigation and other

568

ment—wide regulations on this subject, the courts may regard them as appropriate and apply them in exercise of their equitable jurisdiction depending upon their terms.

■ However, until that time, it is the view of the Court that in Title VII cases involving claims of discrimination by any government department or agency or an independent public agency such as the Postal Service, witnesses who are employees of such department or agency and who testify on behalf of the plaintiff are entitled to the same benefits with respect to pay status while attending court as persons who testify on behalf of the defendant agency or official. Accordingly, plaintiff and all persons who were called by plaintiff and who testified at this trial on his behalf must be compensated by the Postal Service for their attendance to the same extent as witnesses who were called by and testified on behalf of the Postal Service.

For the reasons stated, it is this 29th day of July, 1980,

ORDERED That judgment be and it is hereby entered for the defendants on the discrimination and retaliation claims, and it is further

ORDERED That the Postal Service shall compensate plaintiff and all Postal Service employees who testified at the trial on his behalf for their attendance by granting them administrative leave to the same extent as such leave is granted to Postal Service employees who testified for the defendant.

cases (e. g., Coles v. Martin, Docket No. 73–1626 (D.C., November 30, 1978)) indicate, the general agency practice appears to follow the Manual.