Adolph KIZAS, et al.

v.

William H. WEBSTER, et al., Appellants.

Adolph KIZAS, et al., Appellants

v.

William H. WEBSTER, et al.

Nos. 82–1477, 82–1511.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 1983.

Decided April 26, 1983.

Philip L. Chabot, Jr. and Mark S. Laufman, Washington, D.C., for appellants in 82–1511 and appellees in 82–1477.

Marleigh D. Dover, Atty., Dept. of Justice, with whom Stanley S. Harris, U.S. Atty. and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellees in 82–1511 and appellants in 82–1477.

Before WALD and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court in parts I and II filed by Senior Circuit Judge BAZELON.

Opinion for the Court in part III filed by Circuit Judge GINSBURG.

BAZELON, Senior Circuit Judge:

For many years, the Federal Bureau of Investigation ("FBI" or "Bureau") accorded a "special preference" to its clerical and support employees when making appointments to the position of Special Agent ("SA"). The Bureau substantially modified this preference in 1977 by adopting more stringent SA selection criteria and by implementing an affirmative SA hiring program for women and minorities. Adolph Kizas et al., representing a class of present and former FBI employees, challenge these changes. Named as defendants are FBI Director William H. Webster, former Director Clarence J. Kelley, and the United States of America.

In Number 82–1477, Webster et al. appeal a judgment of the district court holding that the modification of the special preference constituted a "taking" of the employees' "property" in violation of the fifth amendment and the Tucker Act.[1] In Number 82–1511, the employees cross-appeal an accompanying judgment dismissing their claim that the affirmative hiring program violates the fifth amendment and Title VII.[2]

For the reasons set forth below, we (1) reverse the district court's determination that the employees possessed vested property rights in the former special preference, compensable under the fifth amendment's takings clause or the Tucker Act; and (2) affirm the district court's dismissal of the employees' equal protection and Title VII challenges to the Bureau's affirmative hiring program.

## I. BACKGROUND

### A. The Controversy

The FBI recruits Special Agents[3] through a variety of "programs" based on

---

1. See Kizas v. Webster, 492 F.Supp. 1135, 1144–50 (D.D.C.1980) (finding liability under fifth amendment) [hereinafter cited without cross-reference as "Opinion I"]; Kizas v. Webster, 492 F.Supp. 1151, 1153–56 (D.D.C.1980) (on motions to amend judgment and amend complaint) (adding Tucker Act jurisdiction) [hereinafter cited without cross-reference as "Opinion II"]. See also Kizas v. Webster, 532 F.Supp. 1331 (D.D.C.1982) (damage award) [hereinafter cited without cross-reference as "Opinion III"].

2. See Opinion I, 492 F.Supp. at 1151; Opinion II, 492 F.Supp. at 1152–53. The employees also challenge the methodology of the district court's damage award, see Opinion III, and the court's ruling that Webster and Kelley are immune from individual liability, see Opinion I, 492 F.Supp. at 1150–51.

3. Special Agents "conduct criminal, security, and civil investigations covering a variety of classifications of cases over which the FBI has investigative jurisdiction." Federal Bureau of

professional skills.[4] Candidates are eligible for consideration in the "Modified Program" if they are at least twenty-three years old, have a college degree, and have at least three years of "professional, executive, complex investigative or other specialized experience."[5] Candidates meeting these threshold requirements undergo a battery of qualifying examinations, and are then competitively rank-listed. Once the Bureau determines the number of Modified Program slots in a given SA training class,[6] candidates from the list are considered for appointment in rank-order.[7]

Until 1977, a "special preference" governed the participation of FBI employees in the Modified Program. This preference, developed as part of the Bureau's Upward Mobility Plan,[8] permitted clerical and support personnel to count their time with the Bureau toward satisfaction of the professional experience requirement; outside clerical work, on the other hand, was not considered "professional" experience. Moreover, Bureau employees' qualifying examinations were evaluated on a pass/fail basis; the examinations of other SA candidates were graded on a competitive scale. Finally, Bureau employees who passed the examinations were considered for appointment on a chronological basis, according to their date of qualification; other SA candidates were considered in competitive rank-order.

These features of the special preference were an attractive incident of employment with the FBI.[9] The parties agree that

Investigation, Upward Mobility Plan, app. at iii (undated) [hereinafter cited without cross-reference as "Plan"], *reprinted in* II Joint Appendix ("JA") at 355.

4. In addition to the "Modified Program," these programs include "Accounting," "Law," "Science," and "Language." In 1977 the Bureau added two additional selection programs—"Female" and "Minority." *See infra* notes 19–20 and accompanying text.

5. *Opinion I,* 492 F.Supp. at 1139.

6. In determining this number, the Bureau considers its need for the special skills offered by applicants from the several qualifying programs. Brief for Appellees at 4. The law and accounting programs typically have received the highest priority. *See* Memorandum from R.G. Hunsinger to Mr. Walsh, at 4 (Mar. 10, 1975), *reprinted in* II JA at 363.

7. A favorable ranking does not guarantee appointment to a training class; candidates must successfully complete further "processing" requirements, including a physical examination, a background investigation, and a round of interviews. The mechanics of these procedures are outlined in Memorandum from Clarence M. Kelley to All Special Agents in Charge (July 20, 1977), *reprinted in* II JA at 407–14.

8. "Upward mobility is defined as a systematic management effort that focuses Federal personnel policy and practice on the development and implementation of specific career opportunities for employees who are in positions which do not enable them to realize their full work potential." Plan at 1, *reprinted in* II JA at 346. Pursuant to Civil Service Commission and Department of Justice instructions, the Bureau is required to identify "target positions" to which employees may advance under the Plan. In addition to the Special Agent position, Bureau employees may aspire to "Fingerprint Identification," "Fingerprint Correspondence," "Supervisory Support and Service," "Typing and Stenographic," "Special Clerk," or "Paraprofessional Accounting Technician." *Id.* app. at i–iii, *reprinted in* II JA at 353–55.

9. The district court summarized the attractions of the special preference as follows:

[F]irst, it assured employees who had met the minimum qualifications that they would be considered for appointment on the basis of seniority; second, when Special Agent classes had to be filled on short-notice, the existence of a listing of qualified applicants gave clerical employees a substantial practical advantage over non-Bureau applicants, whose availability and qualifications could not be so easily and quickly ascertained; third, the procedure afforded the clerical employees an opportunity to meet all qualifications before vacancies were available, thus reducing a prospective applicant's uncertainty about whether he met SA qualifications and providing an early opportunity to cure deficiencies; fourth, the Modified Program permitted Bureau employees to qualify for appointment on the basis of work experience that would not meet the minimum requirements for entrance under the Modified Program if obtained outside the Bureau; and, fifth, the selection procedure guaranteed to a clerical employee that once qualified for appointment, he could not lose his position on the appointment list to a subsequent applicant, even if that applicant was subjectively better qualified.

*Opinion I,* 492 F.Supp. at 1141 (footnotes omitted).

many college graduates joined the Bureau as clerical and support personnel in order to take advantage of the preference. The parties part company, however, in their perceptions of the Bureau's encouragement of this practice. The employees contend that the Bureau offered the preference "as a recruitment device in order to entice the highly-qualified, college-trained plaintiffs to accept positions at the clerical level," and that they "would not have accepted work at the FBI if the promises for advancement had not been made."[10] The Bureau vigorously responds that it "neither gave any assurances that the then current requirements of the Modified Program would remain in effect, nor gave any guarantees that applicants would become Special Agents when qualified."[11] The employees counter, and the district court agreed on summary judgment, that these disclaimers merely went to the likelihood of appointment *once an employee had qualified for the special preference,* and did not sufficiently indicate that the preference *itself* might be modified.[12]

An FBI "Ad Hoc Task Force" unanimously concluded in 1976 that the special preference system should be overhauled.[13] Specifically, the group found that the system (1) was not ensuring the appointment of the best qualified Modified Program candidates to the Special Agent position, and (2) had caused morale problems among the Bureau's career personnel to reach a "critical state" by "erod[ing] the true meaning of career development and upward mobility for our experienced career-minded employee."[14]

Acting on the Task Force recommendations, Director Kelley ordered implementation of a "New Special Agent Selection

10. Complaint ¶¶ 8, 19, *Kizas v. Webster,* Civ. No. 78–983 (D.D.C.) (filed May 31, 1978) [hereinafter cited without cross-reference as "Complaint"], *reprinted in* I JA at 27, 30.

11. Brief for Appellees at 4–5 (citations omitted). In support of these assertions, the Bureau cites to various disclaimers in recruiting brochures, clerical application forms, personnel circulars, and internal memoranda. *See, e.g., id.* at 4–6; Reply Brief for Appellees at 3–4; documents reprinted in II JA at 360–64, 365–67, 396–97.

12. The court concluded that,
> [t]o be effective in defeating expectations of clerical employees, the [disclaimers] would have to have been clearly addressed to the preference at issue . . . . The notices by defendants after 1972 that clerical employees could not be "guaranteed" advancement to Special Agent are too vague, too broad, and too imprecise to limit the preference here at issue, . . . particularly in view of the importance, duration, and widespread knowledge of the policy. Indeed, plaintiffs have never claimed a "guarantee" of advancement, only a preference for consideration.

*Opinion I,* 492 F.Supp. at 1148 (citation omitted).

13. *See* Special Agent Pre-Employment Selection System, Task Force Findings (March 1977) [hereinafter cited without cross-reference as "Task Force Findings"], *reprinted in part in* II JA at 384–401. The Task Force was comprised of 16 Special Agents and support personnel, and was assisted by an outside management consulting firm. Its mission was not limited to revising the Upward Mobility Plan, but covered recruitment and testing of SA applicants under all of the Bureau's qualifying programs.

14. Memorandum from W.K. DeBruler to the Director, at 34–35 (Dec. 16, 1976), *reprinted in* II JA at 382–83. The employee morale problems arose because
> [f]requently, the college educated employee who begins his Bureau career in a low level support position does so with the clear intent of becoming eligible for and receiving promotion to the Special Agent position in three years. During this waiting period, particularly at FBIHQ, these employees receive very little experience and/or expertise in FBI work responsibilities and very often develop a "shelf-time" attitude. . . .
> Many high school graduates work their way through the support ranks, while sacrificing to obtain a college degree. A great many of these employees become extremely skilled and experienced in many areas of the Bureau's work during this time while obtaining a college degree to become eligible for the Special Agent position. This is understandable since the majority have as much as seven to ten years of Bureau service by this time. Under current policy, these veteran employees are then placed on the eligibility list for Special Agent consideration behind the on-board college graduate who has three years' service.

*Id.; see also* Task Force Findings at 20–22, *reprinted in* II JA at 395–97.

System" ("NSASS") in April 1977.[15] The NSASS has "radically" changed the Bureau's Upward Mobility Plan.[16] Although clerical and support employees can still count their time with the Bureau toward satisfaction of the professional experience requirement, pass/fail examinations and the chronological ranking system have been eliminated. Under the NSASS, Bureau employees seeking an SA appointment pursuant to the Modified Program are competitively ranked with all other Modified Program applicants on the basis of test and interview scores.

Clerical and support personnel who had qualified for chronological consideration under the old system registered several complaints with the Bureau, requesting that their preferential status be "grandfathered."[17] The Bureau rejected these suggestions on the grounds that (1) the employee morale problems engendered by the old system demanded immediate rectification, and (2) the goal of selecting "only the best qualified individuals . . . for further consideration" should proceed without delay.[18]

When the Bureau first implemented the NSASS in 1977, just over one percent of Special Agents were women, and fewer than five percent were minorities. Concluding that "certain investigative functions could be performed more effectively by particular minorities or by women," and that the SA force should on principle be "as representative of the community as possible," the Bureau modified the NSASS by adding two affirmative hiring programs— "Female" and "Minority"—to the existing SA selection programs.[19] The Bureau set the test score cut-offs for applicants in the new programs at a lower level than those for applicants in the other programs.[20]

## B. The District Court Proceedings

On May 31, 1978, a group of clerical and support employees filed a class action in district court against Director Webster and

---

**15.** Memorandum from Clarence M. Kelley to All Employees (Apr. 19, 1977), *reprinted in* II JA at 402–03.

**16.** Affidavit of Clarence M. Kelley ¶ 5 (July 27, 1979) [hereinafter cited without cross-reference as "Kelley Affidavit"], *reprinted in* I JA at 97.

**17.** *See, e.g.,* Memorandum from S.R. Burns to Mr. Long (May 23, 1977) (summarizing employee requests for addition of "grandfather clause" to the NSASS), *reprinted in* II JA at 404–06; Letter from Philip L. Chabot, Jr. to William H. Webster (Apr. 18, 1978) (threatening litigation), *reprinted in* II JA at 425–26; Memorandum from W.O. Cregar to R.E. Long (Oct. 24, 1978) (NSASS "will . . . work a severe hardship" on clerical and support employees; "a hard pill for them to swallow"), *reprinted in* II JA at 450–51.

**18.** Memorandum from Clarence M. Kelley to SAC, Sacramento (Aug. 17, 1977), *reprinted in* II JA at 415–16. Under the NSASS, SA applicants in all qualifying programs were required to be "reprocessed" pursuant to the new procedures, regardless of whether they had already qualified under the old system. Director Kelley stated that "[t]o revert to a previous selection procedure for a single applicant or group of applicants would negate the objective of the new system . . . ." Memorandum from Clarence M. Kelley to All Special Agents in Charge, at 7 (July 20, 1977), *reprinted in* II JA at 413; *see also* Letter from William H. Webster to

Philip L. Chabot, Jr. (May 9, 1978), *reprinted in* II JA at 427.

In response to employee discontent, however, the Bureau did make one important adjustment to the NSASS: Prior to April 4, 1978, the Bureau permitted only *current* employees to qualify for the special preference. After that date, clerical and support personnel who had satisfied the three-year service requirement could qualify for consideration even if they subsequently left the Bureau's employ. *See* Brief for Appellees at 8.

**19.** Brief for Appellees at 7. The genesis of the affirmative hiring program is ambiguous. *Compare* Kelley Affidavit ¶ 6 ("[T]he NSASS as I approved it and, to my knowledge, during my tenure as FBI Director did not contain provisions for affirmative hiring."), *reprinted in* I JA at 97, *with* Affidavit of William H. Webster ¶ 6 (Aug. 13, 1979) ("Shortly after I assumed my responsibilities as Director, members of my personal staff determined that the NSASS as originally approved . . . had been modified after its implementation . . . and prior to my appointment as Director. . . . I approved of this modification at the time it came to my attention and continue to approve of it.") [hereinafter cited without cross-reference as "Webster Affidavit"], *reprinted in* I JA at 100.

**20.** *See Opinion I,* 492 F.Supp. at 1143–44; see also documents reprinted in II JA at 428–49, 452–65.

former Director Kelley in their individual and official capacities.[21] Invoking general federal question jurisdiction,[22] the employees argued that their "expectation of special consideration was a property interest that arose out of their employment contract[s]" with the Bureau.[23] Webster and Kelley, they argued, had "unilaterally revoked" this property interest "without compensation or procedure" as required by the fifth amendment.[24] The employees sought relief in the form of (1) money damages for lost income and advancement and for violation of their constitutional rights, (2) an injunction preventing Webster "from continuing his unlawful acts," and (3) a writ of mandamus directing Webster to fulfill his "contractual obligation."[25]

The employees subsequently filed an amended complaint, which repeated in its first count ("the takings count") the allegations of the original complaint, and alleged in its second count ("the discrimination count") that the Bureau's affirmative hiring program for women and minorities violated Title VII[26] and the equal protection component of the fifth amendment's due process clause.[27] The amended complaint sought the identical relief requested in the original complaint.

In a pre-judgment order, the district court held that the employees could pursue a *Bivens*-type action for damages,[28] implied directly from the fifth amendment's takings clause,[29] against Webster and Kelley.[30] On cross-motions for summary judgment, the court then held that the employees possessed "vested contractual rights" in the special preference accorded them under the former upward mobility system.[31] Because the preference was "a significant element of compensation," the court reasoned, "[t]he Bureau could no more take [it] away ... without liability than it could refuse to pay an agreed amount of salary to one of its employees."[32] The court also concluded,

**21.** The employees sought to represent a class defined as

> those members of the FBI clerical and support staff who were employed prior to April 19, 1977 and who (a) were interested in positions as Special Agents, and (b) understood, as a condition of their employment, that once they satisfied minimum requirements for the Special Agent positions they would be given preferential consideration for future Special Agent positions.

Complaint ¶ 4, *reprinted in* I JA at 25. The district court certified the class under Fed.R. Civ.P. 23(b)(1)(A). *Kizas v. Webster,* Civ. No. 78–983 (D.D.C. May 15, 1979) (memorandum and order certifying class) [hereinafter cited without cross-reference as "Class Certification"], *reprinted in* I JA at 72–80.

**22.** 28 U.S.C. § 1331 (1976 & Supp. V 1981).

**23.** Complaint ¶ 21, *reprinted in* I JA at 30.

**24.** *Id.* ¶ 22, *reprinted in* I JA at 30.

**25.** *Id.* at 10–11, *reprinted in* I JA at 31–32.

**26.** Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1976 & Supp. IV 1980).

**27.** Amended Complaint, *Kizas v. Webster,* Civ. No. 78–983 (D.D.C.) (filed Jan. 15, 1979) [hereinafter cited without cross-reference as "Amended Complaint"], *reprinted in* I JA at 54–68. The district court granted the employees' motion to amend their complaint on Febru-

ary 16, 1979. *See* District Court Civil Docket Sheet, *reprinted in* I JA at 1, 12.

**28.** *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**29.** U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation").

**30.** *Kizas v. Webster,* Civ. No. 78–983 (D.D.C. July 5, 1979) (order) [hereinafter cited without cross-reference as "Pre-Judgment Order"], *reprinted in* I JA at 94. The court's sole analysis in support of this decision was a citation to *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), which extended *Bivens* to the equal protection component of the fifth amendment's due process clause. *See infra* note 42.

**31.** *Opinion I,* 492 F.Supp. at 1144–49.

**32.** *Id.* at 1147. The court emphasized that its decision "does not imply that every aspect of FBI employment gives rise to vested contractual rights and that defendants are never free to alter the terms of employment without compensation." *Id.* (citation omitted). The distinguishing features of the preference, the court reasoned, were that it "was significant both to the Bureau and to the affected employees; it was well-understood and regularly used, and stood apart in character and significance from

however, that although *Bivens* damages for this "taking" could be awarded against Kelley and Webster in their official capacities, a qualified good-faith immunity shielded them from individual liability.[33]

Turning to the employees' request for injunctive and mandamus relief, the court held that an order requiring "specific performance" of the former preference would be both improper[34] and, in light of the availability of monetary relief, unnecessary. The court then dismissed the discrimination count, reasoning that a decision in the employees' favor would "probably" give them merely the same relief as that flowing from its judgment on the takings count.[35]

Three months after judgment was entered, the district court substantially altered the jurisdictional foundations of its decision. Noting that the employees' action had become "one essentially for money damages against the United States," the court concluded that the Tucker Act[36] was the "sole independent basis for jurisdiction" over the takings count.[37] Accordingly, it granted the employees' motion to amend their complaint to add Tucker Act jurisdiction and to add the United States as a party defendant.[38] Because Tucker Act jurisdic-

tion over claims exceeding $10,000 rested exclusively in the Court of Claims,[39] the district court also directed the employees either to transfer all their claims to the Court of Claims or to bifurcate their class, with the district court retaining jurisdiction only over individual claims that did not exceed $10,000.

At the same time, the court declined to reconsider its dismissal of the discrimination count, though for different reasons than those relied upon in its initial decision. With respect to the employees' equal protection claim, the court held that Title VII constitutes the exclusive remedy for claims of employment discrimination by federal personnel subject to its protection. The court then dismissed the Title VII claim, holding that the employees had failed to observe the Act's administrative charge-filing requirement.

The employees elected to bifurcate their class. As a result, the district court transferred all takings claims over $10,000 to the Court of Claims.[40] Summary judgment on the remaining claims was awarded on February 18, 1982.[41] This appeal and cross-appeal followed.

other aspects or incidents of FBI employment. It was not a mere condition of employment." *Id.*

**33.** *Id.* at 1150. The court reasoned that the case presented "difficult questions of constitutional law," and noted the absence of any evidence that Kelley or Webster had acted with malicious intent. *Id.* at 1151.

**34.** The court stated that the defendants "should not be prevented from bringing about substantial changes that they find necessary and appropriate." *Id.* at 1149–50 (footnote omitted).

**35.** *Id.* at 1151.

**36.** 28 U.S.C. §§ 1346(a)(2), 1491 (1976 & Supp. V 1981). Section 1491 provides:

The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Section 1346(a)(2) gives the district courts concurrent jurisdiction over Tucker Act claims that do not exceed $10,000.

**37.** *Opinion II,* 492 F.Supp. at 1153.

**38.** The government did not object. *See id.* at 1156.

**39.** *See supra* note 36. The functions of the Court of Claims have been transferred to the United States Court of Appeals for the Federal Circuit. *See* Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25.

**40.** The court transferred the claims of 612 employees. *See* Complaint, *Alford v. United States,* No. 249–81C (Ct.Cl.) (filed Apr. 17, 1981). That action is being held in abeyance pending resolution of the instant appeal.

**41.** The district court awarded a total of $490,-603 to 70 class members. Its theory of damages was that the employees should be placed in the financial position they would have been in had they not accepted clerical and support positions with the Bureau. Accordingly, the court awarded "reliance expenditures"—moving expenses incurred in order to accept FBI

## II. THE TAKINGS COUNT

Whether their claim is grounded on the Tucker Act or implied directly from the fifth amendment's takings clause,[42] the employees are entitled to relief only if they have a vested right to the former special preference. They have advanced two theories in support of such a right. First, they argue that the preference is an element of deferred compensation "due and owing" them. Second, they invoke procedural due process cases to argue that their "legitimate expectations" in receiving the preference transformed the preference into an indefeasible property right.

The employees' first theory contradicts settled doctrines of federal employment and sovereign immunity. Their second theory, analogizing "property interests" protected by the due process clause to "property" protected by the takings clause, is fundamentally misconceived. Notwithstanding the equitable force of their claims, we therefore conclude that, as a matter of law,

the employees had no vested rights in the former special preference.[43]

### A. The Preference as an Element of Compensation

Although the employees filed four complaints over the course of the district court litigation, their theory of entitlement remained constant: that the special preference was a vested form of deferred compensation guaranteed by their "employment contract[s]" with the Bureau.[44] They argued that the Bureau offered this preference "as consideration for their acceptance of employment" and that, in turn, they gave consideration through years of support and clerical labor and through foregone alternative employment.[45] The district court agreed that the employees possessed "vested contractual rights" in the preference, reasoning that "[t]he history of representation, reliance, and mutual exchange of benefits contains all the elements of a classic contract implied in fact or of promissory estoppel." [46] In the court's view, "[t]he fact that the employer in this case is the govern-

---

employment—and "reliance losses"—defined as the difference between (1) the employees' actual salaries from the time they joined the Bureau until either (a) the time they left or (b) April 4, 1978, whichever was earlier; and (2) the average amounts that persons of their age, sex, race and educational levels earned. *Opinion III*, 532 F.Supp. at 1333–34. The court denied compensation for the alleged 20-year diminution in the employees' earning capacities resulting from their service with the Bureau; moving expenses of employees who left the Bureau after the special preference was modified; college expenses allegedly incurred in reliance on the Modified Program; and alleged reduced wages of spouses. *Id.* at 1334–35.

42. Our disposition does not require that we decide whether the district court properly implied a *Bivens*-type action for damages directly from the fifth amendment's takings clause. *See supra* note 30 and accompanying text. Resolution of this question would involve an analysis whether (a) the Tucker Act is an equally effective remedy, and (b) Congress intended the Tucker Act to supplant other remedies. *See Carlson v. Green*, 446 U.S. 14, 18–23, 100 S.Ct. 1468, 1471–74, 64 L.Ed.2d 15 (1980) (also noting necessity for inquiry into "special factors counselling hesitation in the absence of affirmative action by Congress") (citation omitted). *See also Bush v. Lucas*, 647 F.2d 573, 576–77 (5th Cir.1981) (federal employment re-

lationship "is a special consideration which counsels hesitation in inferring a *Bivens* remedy"), *cert. granted,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982). The district court did not undertake such an analysis. We are unaware of any other case extending *Bivens* to the takings clause.

43. Thus we need not reach the other issues presented by the district court's judgment on the takings count. In addition to the propriety of a *Bivens*-type remedy, *see supra* note 42, these include (1) whether summary judgment on the contested facts of the case was proper; (2) whether, assuming the employees possessed vested property rights in the special preference, the Bureau's modification of the preference resulted in a constitutionally cognizable taking, *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); (3) whether Kelley and Webster were individually immune from *Bivens* liability; and (4) whether the district court properly calculated the employees' damages.

44. Complaint ¶ 21, *reprinted in* I JA at 30.

45. *Id.* ¶¶ 19–21, *reprinted in* I JA at 30.

46. *Opinion I*, 492 F.Supp. at 1145, 1147 (footnotes omitted).

ment . . . does not alter either the result or the analysis." [47]

■ We respectfully conclude that the district court's decision is irreconcilable with well-established doctrines of federal employment. With limited exceptions not relevant to the instant case, federal workers serve by appointment, and their rights are therefore a matter of "legal status even where compacts are made." [48] In other words, their entitlement to pay and other benefits "must be determined by reference to the statutes and regulations governing [compensation], rather than to ordinary contract principles." [49] "Though a distinction between appointment and contract may sound dissonant in a regime accus-tomed to the principle that the employment relationship has its ultimate basis in contract, the distinction nevertheless prevails in government service." [50]

Applying these doctrines, courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel. These cases have involved, *inter alia,* promises of appointment to a particular grade or step level,[51] promises of promotion upon satisfaction of certain conditions,[52] promises of extra compensation in exchange for extra services,[53] and promises of other employment benefits.[54]

**47.** *Id.* at 1145. In support of this conclusion, the court reasoned that,

[t]o secure fifth amendment protection, an interest need not have any special "constitutional" character; rather, constitutional protection is accorded interests that are derived independently from such sources as state law or contract. A contract right, such as the one at issue here, is plainly property for purposes of the fifth amendment, which the government cannot destroy without due process or just compensation.

*Id.* (citations and footnotes omitted).

**48.** *Kania v. United States,* 650 F.2d 264, 268 (Ct.Cl.) (citation omitted), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981).

**49.** *United States v. Larionoff,* 431 U.S. 864, 869, 97 S.Ct. 2150, 2154, 53 L.Ed.2d 48 (1977) (footnote omitted). *See also Army & Air Force Exch. Serv. v. Sheehan,* 456 U.S. 728, 102 S.Ct. 2118, 2124–26, 72 L.Ed.2d 520 (1982) (federal employment regulations do not create implied-in-fact contracts); *Bell v. United States,* 366 U.S. 393, 401, 81 S.Ct. 1230, 1235, 6 L.Ed.2d 365 (1961) ("common-law rules governing private contracts have no place" in federal employment); *Bigler v. United States,* No. 234–81C, slip op. at 3 (Ct.Cl. May 18, 1982); *Shaw v. United States,* 640 F.2d 1254, 1260 (Ct.Cl.1981) ("Federal officials who by act or word generate expectations in the persons they employ, and then disappoint them, do not *ipso facto* create a contract liability running from the Federal Government to the employee,· as they might if the employer were not the government."); *Urbina v. United States,* 428 F.2d 1280, 1284 (Ct.Cl.1970).

**50.** *Riplinger v. United States,* 695 F.2d 1163, 1164 (9th Cir.1983). *See also United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976) (courts may not "tamper" with doctrines of federal employment out of desire to be "responsive to a particular conception of enlightened governmental policy"); *Shaw v. United States, supra* note 49, 640 F.2d at 1260 (government employees' claims that are founded on contract principles are "moral, not legal").

**51.** *See, e.g., Riplinger v. United States, supra* note 50, 695 F.2d at 1164; *National Treasury Employees Union v. Reagan,* 663 F.2d 239, 249–50 (D.C.Cir.1981) (government not estopped from applying hiring freeze to individuals who had received written confirmation of their appointment to government service); *Ganse v. United States,* 376 F.2d 900, 902 (Ct.Cl.1967); *Price v. United States,* 80 F.Supp. 542, 542–43 (Ct.Cl.1948).

**52.** *See, e.g., Qualls v. United States,* 678 F.2d 190, 193–97 (Ct.Cl.1982); *Applegate v. United States,* 211 Ct.Cl. 380, 380–82 (1975) (federal promotion freeze, negating oral and written assurances of promotion, did not constitute breach of contract); *Peters v. United States,* 534 F.2d 232, 234–35 (Ct.Cl.1975).

**53.** *See, e.g., Johnston v. United States,* 175 F.2d 612, 617–19 (4th Cir.1949); *cf. Bielec v. United States,* 456 F.2d 690, 696 (Ct.Cl.1972).

**54.** *Army & Air Force Exch. Serv. v. Sheehan, supra* note 49, 102 S.Ct. at 2124–26 (regulations governing separation procedures do not create implied-in-fact contract); *Chu v. Schweiker,* 690 F.2d 330, 332–34 (2d Cir.1982) (promises to Public Health Service doctors that their residency programs would not be terminated); *Shaw v. United States, supra* note 49, 640 F.2d at 1260 (promises not to redesignate employee's position from career to noncareer status); *Abbott v. United States,* 200 Ct.Cl. 384, 388–90 (1973) (alleged contract regarding computation

The employees argue, however, that this formidable body of precedent is inapposite, because previous cases "involve[d] merely an expectancy over which the government maintained discretion to grant or deny."[55] They seek to draw an "essential distinction between rights already earned and opportunities merely anticipated which distinguishes this case" from previous cases.[56] There are two difficulties with this argument. First, it mischaracterizes precedent: The cases cited above typically involved situations where individuals claimed, as the employees here do, either that they had given "consideration" or that they had detrimentally relied on government assurances.[57] Second, the purported distinction simply begs the question at issue: It fails to demonstrate that the preference *was* an element of compensation rather than an "opportunity merely anticipated."

 That question can only be answered by reference to statute and regulation. Title 5 of the United States Code and its implementing regulations set forth in meticulous detail the compensation that attaches to positions in the government service.[58] These provisions govern all incidents of employee compensation, including basic salaries; salary increases; overtime, holiday and sick pay; life and health insurance benefits; retirement benefits; travel and subsistence allowances; and compensation for injury and unemployment.[59] These provisions are the *exclusive* source of employees' compensation rights.[60] Employees may receive additional perquisites—such as career development programs, educational opportunities, attractive office surroundings, and so forth—but they have *no* indefeasible rights to such incidents.[61] By limit-

of retirement pay: "[N]o property has been taken from [plaintiffs] by the government. They are in reality complaining about what they would have received if the system had not been changed."), *cert. denied,* 414 U.S. 1024, 94 S.Ct. 448, 38 L.Ed.2d 315 (1973).

55. Reply Brief for Appellants at 9.

56. *Id.* at 10.

57. *See, e.g., Riplinger v. United States, supra* note 50, 695 F.2d at 1164 (employee left private sector and began government service in reliance on promises of particular salary level); *National Treasury Employees Union v. Reagan, supra* note 51, 663 F.2d at 245–46 ("federal government played hide-and-seek with jobseekers, assuring them that jobs awaited them and only later—on occasion, after the prospective employee had acted on the assurance of a job—reversing itself"); *Shaw v. United States, supra* note 49, 640 F.2d at 1255 (employee "burned his bridges" in reliance on government promises); *Applegate v. United States, supra* note 52, 211 Ct.Cl. at 380–81; *Abbott v. United States, supra* note 54, 200 Ct.Cl. at 390; *Ganse v. United States, supra* note 51, 376 F.2d at 902.

58. Congress has carved out exceptions, *see, e.g.,* 5 U.S.C. § 5102(c) (1976 & Supp. V 1981), but it is undisputed that the employees in the instant case were Government Schedule ("GS") personnel covered by the provisions of Title 5.

59. *Id.* § 5301 *et seq.*

60. *See id.* § 5107 (GS classifications of positions "are the basis for pay and personnel transactions"); *id.* § 5301 (compensation of GS

workers "shall be fixed and adjusted in accordance with the principles" set forth in Title 5); *id.* § 5536 ("An employee or a member of a uniformed service whose pay or allowance is fixed by statute or regulation *may not receive additional pay or allowance* for the disbursement of public money or *for any other service or duty, unless specifically authorized by law and the appropriation therefor specifically states that it is for the additional pay or allowance.*") (emphasis added).

61. These principles underlie two opinions holding that veterans' civil service preference rights do not create contractual or other property interests. In *Monaco v. United States,* 523 F.2d 935 (9th Cir.1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976), a group of retired military personnel challenged a 1964 statutory modification of the Veterans' Preference Act of 1944, as amended, 5 U.S.C. §§ 3313–3315, 7511–7512, 7701 (1976 & Supp. V 1981). They argued that, "by enlisting in the military service between 1944 and 1964," they had acquired "vested, unrepealable" contract rights to the preference in effect at the time of their military service. *Id.* at 939. The court rejected their claim, holding that the veterans' preference is a mere "gratuity" rather than a "condition" of military service. *Id.* at 939–40. "[W]hatever anticipations a serviceman entertained between 1944 and 1964 with respect to preferential advantage in the federal civil service were no more than some sort of floating expectancy entirely dependent upon the government's bounty. A claim of unconstitutional deprivation cannot be built upon this foundation." *Id.* at 940. *See also Mack v.*

ing compensation rights to those spelled out pursuant to Title 5, thereby barring " 'any additional pay, extra allowance, or compensation, *in any form whatever,*' " [62] Congress intended that " '[e]xtras,' which are such a fruitful subject of disputes in private contracts, were to be eliminated from the public service." [63] Because the special preference at issue here was not defined as an element of compensation by any statute or regulation, the employees' argument that they had a vested right to its retention must fail.[64]

▮ Even if the special preference had been created by statute or regulation, however, money damages from the government for its rescission would be precluded for another reason: The Supreme Court has repeatedly rejected the proposition that

"the violation of any statute or regulation relating to federal employment automatically creates a cause of action against the United States for money damages." [65] Jurisdiction to award such damages exists only where the statutes or regulations on which rights are premised can *also* "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." [66] Congress has delineated with precision the circumstances in which "unjustified or unwarranted personnel actions" may be remedied through money damages from the public fisc.[67] The employees in the instant case do not fall within the scope of any of these statutory provisions. These provisions "would be rendered superfluous" [68]—and Congress's intent therefore "would obviously be subverted" [69]—if we

*United States,* 635 F.2d 828, 832 (Ct.Cl.1980) (provisions of Veterans' Preference Act "do not create an interest in property subject to being taken for public use"), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981).

**62.** *Johnston v. United States, supra* note 53, 175 F.2d at 617 (emphasis in original) (quoting statutory predecessor of 5 U.S.C. § 5536).

**63.** *Mullett's Adm'x v. United States,* 150 U.S. 566, 570, 14 S.Ct. 190, 192, 37 L.Ed. 1184 (1893). *See also United States v. Saunders,* 120 U.S. 126, 129, 7 S.Ct. 467, 468, 30 L.Ed. 594 (1887); *Urbina v. United States, supra* note 49, 428 F.2d at 1285; *Schaible v. United States,* 135 Ct.Cl. 890, 898 (1956) (Title 5 eliminates "[a]ny suggestion of barter and trade in public employment").

**64.** The employees appear to argue, however, that the Director's broad delegated discretion over Bureau personnel management, *see* 28 C.F.R. § 0.137 (1982), supplants the compensation scheme set forth in Title 5. This argument easily fails. It is well-established that general grants of discretion do not override the extra-compensation prohibitions unless *explicitly* spelled out by statute. *See, e.g., Johnston v. United States, supra* note 53, 175 F.2d at 615–17 (collecting cases). For examples of such explicit exceptions, see 5 U.S.C. §§ 5922, 5942, 5947 (1976 & Supp. V 1981); 22 U.S.C. §§ 287e–1, 2389, 2513 (1976 & Supp. V 1981); 39 U.S.C. § 1001 (1976). Rather, general grants of discretion with respect to "compensation" extend only to those details of pay administration that have been delegated by Congress. *See, e.g.,* 5 U.S.C. § 5545(c) (1976 & Supp. V 1981) (determining appropriate method for calculating overtime pay).

**65.** *United States v. Testan, supra* note 50, 424 U.S. at 401, 96 S.Ct. at 954. *See also Army & Air Force Exch. Serv. v. Sheehan, supra* note 49, 102 S.Ct. at 2124–25; *United States v. Hopkins,* 427 U.S. 123, 130, 96 S.Ct. 2508, 2512, 49 L.Ed.2d 361 (1976).

**66.** *United States v. Testan, supra* note 50, 424 U.S. at 400, 96 S.Ct. at 954 (quoting *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009, 178 Ct.Cl. 599 (Ct.Cl.1967)). This rule derives from the familiar principle that a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969). *See also Army & Air Force Exch. Serv. v. Sheehan, supra* note 49, 102 S.Ct. at 2124–25; *Donovan v. United States,* 580 F.2d 1203, 1206–08 (3d Cir.1978) (failure to promote employee in accordance with applicable regulations not remediable through back-pay award); *Mack v. United States, supra* note 61, 635 F.2d at 832 (Army's alleged failure to accord plaintiff a disabled veteran's hiring preference not remediable through money damages).

**67.** 5 U.S.C. § 5596 (1976 & Supp. V 1981) (Back Pay Act); *see also, e.g.,* 42 U.S.C. §§ 2000e–5, 2000e–16 (1976 & Supp. IV 1980) (Title VII back pay and other retroactive relief).

**68.** *United States v. Testan, supra* note 50, 424 U.S. at 404, 96 S.Ct. at 956.

**69.** *Army & Air Force Exch. Serv. v. Sheehan, supra* note 49, 102 S.Ct. at 2125.

upheld the district court's judgment in the instant case.[70]

The employees invoke language in several Supreme Court opinions that, they claim, supports their "deferred compensation" analysis. The Court has noted, for example, that a government worker may recover for the denial "of pay due for services already performed, but still owing,"[71] and for "the benefit of the position to which he was appointed."[72] The employees' argument that such language "precisely" characterizes their case[73] merely begs the question of what benefits were in fact "due and owing" them. As discussed above, that question is answered exclusively by reference to the statutes and regulations governing compensation. The Court's language can in no way be read as equitably expanding the definition of "pay" that is "due" government personnel.[74]

## B. The Analogy to Due Process "Property Interests"

On appeal, the employees belatedly concede the "verity" of the doctrine that federal personnel do not have contractual relationships with the government.[75] They argue, however, that the district court's "reference to certain contract principles" should now be read as "merely provid[ing] an analytical framework in which to consider the reasonableness of the expectations of the parties."[76] In other words, they would distinguish between rights vesting through contract and rights vesting through "legitimate expectations which, once created, are simply a recognition that the Tucker Act protects private property from illegal government levy, regardless of whether any other statute or regulation authorizes recovery. *See Eastport S.S. Corp. v. United States, supra* note 66, 372 F.2d at 1007–08. Where a claimant alleges that property rights have been *created* through the operation of statutes or regulations, on the other hand, damages may be recovered *only* if the relevant provisions so authorize. *See supra* notes 65–66 and accompanying text. Because the employees' compensation rights can only be defined by reference to statute and regulation, they do not fall within the scope of the "improperly exacted or retained" exception.

The employees attempted to bolster their claim at oral argument through citation to a series of habeas corpus cases permitting *rescission* of military enlistment commitments procured through official misrepresentations. *See, e.g., Pence v. Brown,* 627 F.2d 872 (8th Cir. 1980); *Helton v. United States,* 532 F.Supp. 813 (S.D.Ga.1982); *Withum v. O'Connor,* 506 F.Supp. 1374 (D.P.R.1981). As those cases have themselves emphasized, however, they are "quite different from a suit against the government for misrepresentations in contracting in which the complaint seeks money damages or specific performance." *Pence v. Brown, supra,* 627 F.2d at 874.

70. This jurisdictional limitation does not, of course, extend to the employees' *Bivens*-type action against Kelley and Webster. Even assuming the propriety of such a remedy, *see supra* note 42, the employees' claim is defeated because no vested right subject to a taking existed in the first place. *See supra* notes 48–64, *infra* notes 71–88, and accompanying text.

71. *United States v. Larionoff, supra* note 49, 431 U.S. at 879, 97 S.Ct. at 2159 (distinguishing the "serious constitutional questions [that] would be presented" by such a case from instances of mere prospective reductions in anticipated pay).

72. *United States v. Testan, supra* note 50, 424 U.S. at 402, 96 S.Ct. at 955. The district court also cited to this language in support of its holding. *Opinion I,* 492 F.Supp. at 1148–49.

73. Reply Brief for Appellants at 10.

74. Reliance on other language is similarly unavailing. In holding that jurisdiction to award money damages against the United States "cannot be premised on the asserted violation of regulations that do not specifically authorize awards of money damages," for example, the Court has noted an exception for suits seeking the return of property "improperly exacted or retained." *Army & Air Force Exch. Serv. v. Sheehan, supra* note 49, 102 S.Ct. at 2125 & n. 11 (quoting *United States v. Testan, supra* note 50, 424 U.S. at 401, 96 S.Ct. at 954). It might be argued that the employees fall within this exception, on the theory that the Bureau "improperly exacted" their services through promises of preferential consideration. The "improperly exacted or retained" rule, however, is

75. Response in Opposition to Motion to File Affidavits at 2 (filed Nov. 8, 1982).

76. *Id.* at 1–2. *See also* Reply Brief for Appellants at 8 ("The district court did not premise liability upon a contract.").

protected from divestiture without compensation." [77]

■■■■ In support of this purported distinction, the employees invoke a familiar line of cases holding that, for purposes of procedural due process guarantees, a person has a "property interest" in a governmentally conferred benefit if he has a "legitimate claim of entitlement" to the benefit.[78] Where such a "property interest" exists, and an individual's entitlement turns upon material questions of disputed fact, the due process clause guarantees minimum procedural protections, typically notice and an evidentiary hearing, when the individual is deprived of the benefit.[79] In the realm of federal employment, protected "property interests" can arise not only through operation of statute and regulation, but also through "agency-fostered policies or understandings" [80] and the "implicit ... overall workings of a particular government employer." [81]

The employees correctly note that the district court relied heavily on these due process cases in fashioning its conclusion that the special preference was a "vested contractual right." Neither the court nor

the employees, however, examined the presupposition that underlies reliance on these cases: that a "legitimate claim of entitlement" rises to the level of "property" protected by the takings clause.

■■■ This presupposition is without foundation. As a leading commentator has admonished, "[t]he fifth amendment employs two independent clauses to address two independent issues. A claim of *deprivation* of property without due process of law cannot be blended as one and the same with the claim that property has been *taken* for public use without just compensation." [82] A "legitimate claim of entitlement" to a government benefit does not transform the benefit *itself* into a vested right. Rather, due process "property interests" in public benefits are "limited, as a general rule, by the governmental power to remove, through prescribed procedures, the *underlying source of those benefits.*" [83]

*Richardson v. Belcher* [84] illustrates this distinction. In that case, the district court had held that recipients of social security disability benefits possessed "indefeasible" property rights that could not be divested by benefit-offset provisions enacted after

**77.** Response in Opposition to Motion to File Affidavits, *supra* note 75, at 2.

**78.** *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *see also Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

**79.** *See generally* G. GUNTHER, CONSTITUTIONAL LAW 646–61, 668–69 (10th ed. 1980).

**80.** *Colm v. Vance,* 567 F.2d 1125, 1131 (D.C. Cir.1977); *see also Ashton v. Civiletti,* 613 F.2d 923, 928–29 (D.C.Cir.1979).

**81.** *Colm v. Vance, supra* note 80, 567 F.2d at 1128 (citations omitted).

**82.** J. SACKMAN, NICHOLS' THE LAW OF EMINENT DOMAIN § 4.3, at 187 (rev. 3d ed. Cum.Supp.1982) (footnote omitted) (emphasis in original). *But see* L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 9–2, at 459 n. 11 (1978) ("The body of rules determining which expectations constitute compensable property interests and which do not ... plainly requires reconsideration in light of the broader definition of property interests now employed in the law of procedural due process. There seems no good reason why the broader

definition should not be extended to the takings context.") (citations omitted).

**83.** *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 796, 798, 100 S.Ct. 2467, 2481, 2482, 65 L.Ed.2d 506 (1980) (Blackmun, J., concurring in the judgment) (emphasis added) ("Public benefits are not held in fee simple."). *See also Geneva Towers Tenants Org. v. Federated Mortgage Investors,* 504 F.2d 483, 494 n. 2 (9th Cir.1974) (Hufstedler, J., dissenting) ("The interest in a benefit that gives rise to an entitlement cannot be an absolute right. If the beneficiary's right to receive the benefit were absolute, the Government without awarding him just compensation could not deprive him of the right even after prior notice and hearing."); Wilkinson, *Goss v. Lopez: The Supreme Court As School Superintendent,* 1975 SUP.CT.REV. 25, 58–59 (procedural due process doctrine "does not interfere with a state's substantive lawmaking capacity .... The whole concept of entitlement, in fact, only takes its cue from state or federal substantive law.").

**84.** 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

they had begun to receive benefits.[85] The district court grounded its decision on *Goldberg v. Kelly*,[86] which held that entitlement to welfare benefits is in the nature of a "property interest" protected by procedural due process guarantees. The Supreme Court reversed, emphasizing the difference between entitlements and indefeasible rights: "[T]he analogy drawn in *Goldberg* between social welfare and 'property,' . . . cannot be stretched to impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits."[87]

The district court's judgment in the instant case rested on the same sort of analogy to procedural due process principles that was rejected in *Belcher*. If a clerical employee had arbitrarily been denied placement on the chronological list, his "legitimate claim of entitlement" to the special preference might well have guaranteed him minimum procedural safeguards. But here the underlying entitlement was *itself* abolished. Broad due process "property" concepts are therefore inapposite to the question whether the preference was an element of deferred compensation, a question governed *exclusively* by the doctrines outlined above in Part II–A.[88]

GINSBURG, Circuit Judge:

### III. THE DISCRIMINATION COUNT

The second count (Count II) of the Kizas complaint[89] challenges the phase of the

---

**85.** *Belcher v. Richardson,* 317 F.Supp. 1294, 1297–98 (S.D.W.Va.1970).

**86.** 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The district court viewed *Goldberg* as effectively overruling *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), which held that contributors to the social security fund have no indefeasible property rights to receive benefits.

**87.** 404 U.S. at 81, 92 S.Ct. at 257 (citation omitted).

**88.** The employees' complaints charged not only that the Bureau had deprived them of vested rights to the special preference, but that it had done so in a procedurally defective manner. *See, e.g.,* Complaint ¶ 23 (Bureau "did not provide any hearing or notice to plaintiffs" prior to adopting the NSASS; employees "had no opportunity to contest the termination of their privileged status"), *reprinted in* I JA at 31. This claim of a due process right to participate in Bureau modifications of the Upward Mobility Plan confuses disputes involving an individual's entitlement to a benefit with situations involving across-the-board revocation of the benefit *itself.* The distinction is critical. As Justice Blackmun cogently observed in *O'Bannon v. Town Court Nursing Center:*

> The Constitution would not have entitled John Kelly to a fair hearing if New York had chosen to disband its public assistance programs rather than to cut off his particular award. See *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Nor would Texas have had to afford process to Professor Sindermann had it decided for budgetary reasons to close Odessa Junior College. See *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). And we would be surprised to learn that

> Dwight Lopez had a constitutional right to procedures before the Ohio Department of Education suspended classes at Columbus High School for 10 days due to the discovery of faulty electrical wiring requiring that much time for repair work. See *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

*Supra* note 83, 447 U.S. at 798, 100 S.Ct. at 2482 (Blackmun, J., concurring in the judgment).

Even assuming *arguendo* that the employees had due process "property interests" in retention of the special preference, the procedures available to them for challenging the NSASS were constitutionally sufficient. Theirs was manifestly not a case of "grievous loss" requiring prior notice and hearing. *Compare Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 12–22, 98 S.Ct. 1554, 1561–67, 56 L.Ed.2d 30 (1978); *Goldberg v. Kelly, supra* note 86, 397 U.S. at 264, 90 S.Ct. at 1018. After the Bureau announced its implementation of the NSASS, the employees were given several administrative opportunities to challenge the new system, and the Bureau gave rational, legitimate reasons in rejecting their requests that the NSASS be applied only to prospective clerical and support personnel. *See supra* notes 17–18 and accompanying text. And the employees have had, of course, a full opportunity to federal court review of the Bureau's action. *See, e.g., Mathews v. Eldridge,* 424 U.S. 319, 349, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). No further safeguards were constitutionally required.

**89.** The original complaint, filed May 31, 1978, stated only the takings count, *see supra* text at notes 21–25; an order granting leave to file an amended complaint adding the discrimination count was filed February 16, 1979. *See supra* note 27.

NSASS associated with the Bureau's affirmative hiring program.[90] Two new Special Agent selection tracks were established in this phase, one for women, one for members of certain minority groups.[91] These tracks, the Kizas complainants contend, exacerbated removal of the marked preference formerly accorded the class of clerical employees to which they belong, a class largely composed of white males.[92] The new tracks, they allege, created sex- and race-based preferences in violation of Title VII of the Civil Rights Act of 1964 and the fifth amendment to the Constitution.

Ultimately, the district court dismissed the race and sex discrimination challenge, holding crisply that (1) Title VII "constitutes the exclusive remedy for claims of employment discrimination by federal employees subject to its protection," and that (2) the Kizas complainants could not pursue a Title VII action in court because they had

neglected a precondition to suit—they had failed to file a discrimination charge at the administrative level. *Opinion II,* 492 F.Supp. at 1151.[93] The dismissal of Count II on the grounds stated correctly reflects the governing law and is therefore affirmed.

**A. Exclusivity of Title VII for Covered Federal Employees**

 Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e–2, 2000e–3 (1976). Section 717 of Title VII, added by section 11 of the Equal Employment Opportunity Act of 1972, 86 Stat. 103, 111 (codified at 42 U.S.C. § 2000e–16 (1976 & Supp. IV 1980)), extends the statute's protection to federal employees, including "employees . . . in executive agencies as defined in section 105 of Title 5."[94] As

---

We refer in this part of the opinion to the employees as "the Kizas complainants," and designate, as their complaint does, the takings claim as "Count I," the discrimination count as "Count II."

**90.** This phase was introduced after the initial implementation of the NSASS. *See supra* note 19 and accompanying text.

**91.** The discrimination count alleged that "[t]here has never been a judicial finding that the FBI discriminates on the basis of race or sex." Amended Complaint ¶ 36, *reprinted in* I JA at 66. The Bureau's Special Agent employment profile, however, is not in doubt. As the district court found:

> Between 1960 and 1972 [the year Title VII was extended to cover federal employment], the number of black Special Agents was less than one percent of the total number of agents; between 1973 and mid-1979, the percentage of black Special Agents has risen from one percent to 2.55 percent. No female Special Agents were permitted before 1972; since then, the percentage of female Special Agents has risen to 2.18 percent.

*Opinion I,* 492 F.Supp. at 1144.

**92.** At oral argument, counsel for the Kizas complainants stated that the class of clerical employees whose preference had been removed numbered several hundred and that the class included only a few women and a few members of minority groups. (No female clerical employee could have held a preference prior to 1972; until that year, the FBI excluded women from positions as Special Agents. *See supra*

note 91.) The district court's class action certification, *see supra* note 21, framed to fit Count I, the takings count, also encompassed Count II, the employment discrimination count. The court recognized, however, that, for Count II purposes, redefinition of the class eventually might be required "to exclude that subclass of minorities and women who fare better under the present regime." Class Certification at 8, *reprinted in* I JA at 79.

**93.** Prior to this definitive ruling on Count II, the district court had shifted its position on this aspect of the complaint. Initially, in an order dated July 5, 1979, the district court declared that race and sex discrimination "constitutional claims" were not precluded. Pre-Judgment Order at 1, *reprinted in* I JA at 94. On February 15, 1980, however, after holding in plaintiffs' favor on Count I, the district court declared that it was "not necessary" to address Count II because plaintiffs were likely to receive full relief through their recoveries under Count I. *Opinion I,* 492 F.Supp. at 1151. Plaintiffs then moved for reconsideration, urging that relief under the two counts would not be coextensive. The district court, at that point, arrived at its final view of the matter. On April 25, 1980, it denied the motion for reconsideration and directed dismissal of Count II for the two reasons set out in the text accompanying this note. *Opinion II,* 492 F.Supp. at 1152–53.

**94.** 5 U.S.C. § 105 (1976) reads: "For the purpose of this title, 'Executive agency' means an Executive department, a Government corporation, and an independent establishment."

employees of the FBI, an executive agency within section 105's compass, the Kizas complainants are clearly covered by Title VII.[95]

Despite coverage under Title VII, the Kizas complainants contend that they may pursue, additionally or alternately, a claim directly under the fifth amendment. This argument is unavoidably foreclosed by precedent. In *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the Supreme Court derived from the legislative history and structure of the 1972 Act an unqualified holding: Title VII of the Civil Rights Act of 1964, as amended, "provides the exclusive judicial remedy for claims of discrimination in [covered] federal employment." *Id.* at 835,[96] 96 S.Ct. at 1969. The Title VII remedy declared exclusive for federal employees in *Brown v. GSA* precludes actions against federal officials for alleged constitutional violations as well as actions under other federal legislation. *See Gissen v. Tackman,* 537 F.2d 784 (3d Cir. 1976) (en banc).[97] We have followed the Supreme Court's clear instruction, and have no warrant to depart from it in this case. *See Lawrence v. Staats,* 665 F.2d 1256, 1259 (D.C.Cir.1981); *Torre v. Barry,* 661 F.2d 1371, 1374 (D.C.Cir.1981); *Hofer v. Campbell,* 581 F.2d 975, 978 (D.C.Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Richardson v. Wiley,* 569 F.2d 140, 141 (D.C.Cir.1977) (per curiam) (federal employee covered by Title VII may not sue under any other federal statute, *e.g.,* 42 U.S.C. § 1981 (1976), or under the fifth amendment). *See also Morris v. WMATA,* 702 F.2d 1037 at 1040 (D.C. Cir.1983).

*Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), relied upon by the Kizas complainants, leaves untouched the square ruling in *Brown v. GSA* that for the covered federal employee, Title VII is the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." 425 U.S. at 829, 96 S.Ct. at 1966. *Davis* involved employment in the office of a member of Congress in a position outside Title VII's domain. The Court held in *Davis* that section 717 does not foreclose the implication of a claim for damages directly under the fifth amendment when the complainant is "expressly unprotected by [Title VII]." 442 U.S. at 247, 99 S.Ct. at 2278. Citing *Brown v. GSA,* however, the Court noted that Title VII is exclusive when covered federal employees "seek to redress the violation of rights guaranteed by the statute." *Id.* at 247 n. 26, 99 S.Ct. at 2278 n. 26.

The Kizas complainants suggest, in repeated but less than lucid argument, that the Constitution's equal protection principle entails a stricter restraint on classification by race or sex than does Title VII and would shelter them against "reverse" discrimination that the statute may permit. *See* Post-Argument Memorandum at 6–10 (filed Jan. 21, 1983). We need not linger over this suggestion. It suffices to point out that if the statute permitted discrimination *in government employment* that the Constitution prohibits, courts would be

---

**95.** On brief, counsel for the Kizas complainants suggested that, because FBI employment is not within the competitive service, it was doubtful whether Title VII covered Bureau employees. As note 94 and the accompanying text indicate, however, Title VII's coverage of executive agency employees is comprehensive, reaching excepted service as well as competitive service employees. At oral argument, counsel for Kizas conceded that the statute applies to Bureau employees.

**96.** The Court contrasted private sector employment discrimination claims, citing its holding in *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), that "in the context of *private employment*

Title VII did not pre-empt other remedies." 425 U.S. at 833, 96 S.Ct. at 1968 (emphasis in original). *See also, e.g., Poolaw v. City of Anadarko,* 660 F.2d 459 (10th Cir.1981); *Garner v. Giarrusso,* 571 F.2d 1330 (5th Cir.1978) (state and municipal government employees may maintain employment discrimination claims under Civil Rights Act of 1866).

**97.** *See also Purtill v. Harris,* 658 F.2d 134 (3d Cir.1981), —— U.S. ——, 103 S.Ct. 3110, 77 L.Ed.2d 1365 (1983) (relying on *Brown v. GSA* in holding that Age Discrimination in Employment Act preempts judicial remedies based directly on the Constitution for claims of age discrimination in federal employment).

obliged to hold the statute invalid to the extent it conflicted with the superior norm. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *Dothard v. Rawlinson,* 433 U.S. 321, 334 n. 20, 97 S.Ct. 2720, 2729 n. 20, 53 L.Ed.2d 786 (1977) (with respect to government employment, Title VII "would have to be interpreted at the very least so as to conform to the [equal protection principle]").

In sum, the Kizas complainants are comprehensively protected by Title VII against federal employment discrimination. They may not circumvent the "careful and thorough remedial scheme" Congress ordered for them; their access to court is determined by that effective, albeit demanding, statute. *Brown v. GSA, supra,* 425 U.S. at 833, 96 S.Ct. at 1968. We consider next whether the Kizas complainants have met, or should be relieved of the obligation to meet, one of the statute's demands, the administrative charge-filing requirement Congress ordered as a precondition to the maintenance of the Title VII court action challenging employment discrimination by a federal agency.

**B. Title VII's Initial Charge-Filing Requirement for Federal Employees**

 Relief under Title VII, in both private and public sector cases, is generally dependent upon the filing of a timely administrative charge. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Brown v. GSA, supra,* 425 U.S. at 832–33, 96 S.Ct. at 1967–68; *see Porter v. Adams,* 639 F.2d 273, 276 (5th Cir.1981) ("sine qua non" for Title VII civil action regarding federal employment is a complaint formally filed with the agency charged with discrimination). The timely charge-filing requirement, however, is not a jurisdictional prerequisite to suit in district court; it operates "like a statute of limitations, [which] is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans*

*World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982).

Concededly, no named plaintiff in this action, indeed no member of the Count II class that named parties now purport to represent, complied with the charge-filing requirement either on time or belatedly. Nonetheless, the Kizas complainants urge that the district court erred in dismissing their Title VII claim for failure to pursue administrative relief. They argue, primarily, that formal resort to administrative redress would have been futile. To demonstrate the futility of an application for administrative review, and to excuse their total bypass of that route to relief, they cite a late discovery of their attorneys. The Kizas complainants assert that over a year after amending their complaint to include the Count II sex and race discrimination challenge, on April 7, 1980, their attorneys learned that in 1977 a similarly situated individual, Ronald B. Manning, had filed an administrative complaint with the FBI's EEO Office alleging race and sex discrimination stemming from the Bureau's modification of the NSASS to incorporate an affirmative hiring program. Brief for Appellants at 24–25; *see* Reply Brief for Appellants at 21–23.[98]

We explain first why the required recourse to administrative review has special prominence with respect to the Title VII claims of federal employees, and why *Zipes v. Trans World Airlines, Inc., supra,* does not support judicial authorization of the total waiver the Kizas complainants urge. We then turn to the argument that the administrative charge filed by Manning should suffice to cover the class certified by the district court.

. 1. The primary role of federal agencies with respect to complaints of discrimination proscribed by Title VII

 Title VII federal proceedings with respect to private sector employment gener-

---

**98.** Although the Kizas complainants assert that Manning's charge was filed in 1977, Brief for Appellants at 24, the documents submitted to the district court indicate that the charge was filed in October 1978, after unsuccessful informal exchanges between Manning and the Equal Employment Opportunity Counselor in the FBI's New Orleans office. *See* Attachments to Memorandum to Court Addressing New Evidence of Plaintiffs' Exhaustion of Administrative Remedies (filed Apr. 23, 1980), *reprinted in* I JA at 141, 153.

ally originate when the complainant files a charge with the Equal Employment Opportunity Commission (EEOC), the federal authority broadly responsible for enforcement of the statute. *See* 42 U.S.C. § 2000e–5(b), (e) (1976); 29 C.F.R. §§ 1601.6–.14 (1982). The charging party in a private sector case need not first complain to the allegedly offending employer. By contrast, Congress directed federal employees or applicants for federal employment to complain initially to the agency alleged to have violated Title VII. Regulations prescribe in detail the administrative procedures available to the charging party,[99] and the statute hinges court review on prior resort to the agency whose employment practice is challenged. Section 717(c)[100] authorizes the commencement of a civil action once the agency has taken "final action" on the charging party's complaint or, if no "final action" is taken, after 180 days have elapsed from the filing of the "initial charge" with the agency.[101]

■ Congress did not casually impose the requirement that a person charging violation of Title VII by a federal agency initiate his or her complaint with the agency. Nor is the requirement a technicality. Rather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel "primary responsibility" for maintaining nondiscrimination in employment. *See* 42 U.S.C. § 2000e–16(e) (1976 & Supp. IV 1980); *Brown v. GSA, supra,* 425 U.S. at 832, 96 S.Ct. at 1967.

■ Because Congress has unambiguously directed federal employment discrimination complainants to proceed first before the agency charged with discrimination, we have grave doubts whether any futility doctrine can be stretched to sanction court

---

**99.** The Equal Employment Opportunity (EEO) regulations currently in effect appear at 29 C.F.R. §§ 1613.201–.283 (1982). They recodify, without significant change, rules originally issued by the Civil Service Commission, codified at 5 C.F.R. §§ 713.201–.283 (1978). The recodification occurred in 1979 after enforcement and related functions vested in the Civil Service Commission under section 717 of Title VII were transferred to the EEOC pursuant to section 3 of President Carter's Reorganization Plan No. 1 of 1978, 43 Fed.Reg. 19807 (1978), 92 Stat. 3781.

Summarized generally, the regulations require a federal employee to bring his or her complaint to the attention of one of the agency's EEO counselors ordinarily within 30 days of the alleged Title VII violation. If the matter is not resolved at this threshold, the complaint is formally filed with the agency. After the agency's investigation, if relief acceptable to the employee is not offered, the employee may request an evidentiary hearing before an examiner who is not employed by the agency. Final decision is entrusted to the head of the agency or an official designated by the agency head. The employee may appeal the agency's final decision to the EEOC or, in certain cases, the Merit Systems Protection Board, but a court action may be initiated without pursuing administrative relief beyond the agency level.

**100.** 42 U.S.C. § 2000e–16(c) (1976 & Supp. IV 1980). In its entirety, the provision reads:

Within thirty days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Equal Employment Opportunity Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

**101.** *But cf.* 29 U.S.C. § 633a(d) (1976 & Supp. V 1981) (federal employees alleging discrimination under the Age Discrimination in Employment Act need only give notice to appropriate federal official of intent to sue; pursuit of administrative remedies is optional); *Ososky v. Wick,* 704 F.2d 1264 at 1265–1267 (D.C.Cir. 1983) (under Equal Pay Act, in contrast to Title VII, federal employee is not required to seek administrative relief before commencing civil action in court). *See generally* Ralston, *The Federal Government as Employer: Problems and Issues in Enforcing the Anti-Discrimination Laws,* 10 Ga.L.Rev. 717, 724–34 (1976).

adjudication of a Title VII action when no party to the action has ever filed an initial charge with the agency.[102] In any event, the complainants before us have not demonstrated cause to excuse their total bypass of the regulations governing the initiation of Title VII charges by federal employees.

The Kizas complainants cite their counsel's April 18, 1978, letter to the Bureau Director as fair notice to the agency of their grievance. *See* Brief for Appellants at 24 n. 14; letter from Philip L. Chabot, Jr., to William H. Webster (April 18, 1978), *reprinted in* II JA at 425–26. But this letter, sent several months after the FBI established the new selection tracks for women and minorities, protests only the retraction of the preference once accorded the class of clerical employees to which the complainants here belong; the letter says nothing at all about sex or race discrimination at the Bureau. The Kizas complainants further contend that at the administrative level corrective action pursuant to Title VII is envisioned only "as to complaints involving acts of individual discrimination rather than approved programs the discriminatory effect of which is class wide."

Brief for Appellants at 28. This contention is insubstantial. Regulations implementing section 717(b) specifically provide for the processing of class complaints. *See* 29 C.F.R. § 1613.603 (1982). *See also id.* § 1613.602(a) (more generous time limitation for invoking agency processes when employee or applicant "wishes to be an agent").

Nor does the Supreme Court's decision in *Zipes v. Trans World Airlines, Inc., supra,* bear the weight the Kizas complainants would place on it. *Zipes* posed the question "whether the statutory time limit for filing charges under Title VII ... is a jurisdictional prerequisite to a suit in the District Court." 455 U.S. at 387, 102 S.Ct. at 1129. In the context of a private sector Title VII claim, the Court explained in *Zipes* that "the provision for filing charges with the EEOC should not be construed to erect a jurisdictional prerequisite to suit in the district court." *Id.* at 397, 102 S.Ct. at 1134. We have held that the *Zipes* analysis is applicable to *time limitations* for filing administrative charges in federal employment discrimination cases. *Saltz v. Leh-*

---

**102.** *See infra* note 104 and accompanying text.

The Kizas complainants cite *Davis v. Bolger,* 496 F.Supp. 559 (D.D.C.1980), as an instance in which a court applied to a federal sector Title VII claim the rule that "where recourse to agency procedures would be futile because the agency's position is firm a litigant need not first exhaust his administrative remedies before bringing his case to court." *Id.* at 567. But the extraordinary context in which the *Davis v. Bolger* court made this statement has no parallel in this case.

The plaintiff in *Davis* made two routine Title VII claims: he alleged that he was denied a promotion because of his race and sex and that he was the subject of reprisals *after he filed his EEO complaint.* The *Davis* plaintiff, in short, did not bypass the charge-filing requirement.

In his court complaint, however, the *Davis* plaintiff included a third, more novel claim that had not been presented initially to the Postal Service. He assailed the Postal Service's practice, then followed in other federal agencies as well, of paying Postal Service employees who attended Title VII trials as witnesses for the defense for time spent in court, but requiring employees who served as witnesses for Title VII plaintiffs to attend court on their own time. The *Davis* court held that this practice violated

Title VII, construed "in conjunction with 5 U.S.C. § 6322," which "provides on its face for paid leave for a witness summoned 'on behalf of any party.'" *Id.* at 566. The Postal Service had argued, inter alia, that "witnesses who wish to be paid must first file an EEO claim and exhaust their administrative remedies." *Id.* at 567. In rejecting this argument, the court specifically noted: "It is not at all clear that witnesses themselves would have administrative remedies under EEO procedures, since they could not allege discrimination of the type prohibited by Title VII against themselves." *Id.* at n. 34.

*Davis,* in sum, does not aid the Title VII plaintiff who proceeds directly to court on a race or sex discrimination claim. It is simply an example of an altogether appropriate readiness of courts to avoid excessively technical interpretations of the statute. *See, e.g., Gupta v. East Texas State Univ.,* 654 F.2d 411, 414 (5th Cir.1981) (plaintiff who filed EEOC charge complaining of discrimination based on religion and national origin could assert in civil action on that claim an ancillary claim, not filed with the EEOC, for retaliation growing out of the original charge). *See also Gordon v. National Youth Work Alliance,* 675 F.2d 356, 360 (D.C. Cir.1982).

*man,* 672 F.2d 207, 208 (D.C.Cir.1982) (per curiam); *accord Milam v. United States Postal Service,* 674 F.2d 860, 862 (11th Cir. 1982).[103] But nothing in *Zipes* suggests that parties complaining of federal employment discrimination in violation of Title VII should ever be waived into court without filing *any* initial charge with the agency whose practice is challenged. The Court in *Zipes* stressed that the charge-filing provision applicable to private sector claims, 42 U.S.C. § 2000e–5(e) (1976), "appears as an entirely separate provision"; "it does not . . . refer in any way to the jurisdiction of the district courts." 455 U.S. at 394, 102 S.Ct. at 1133. In contrast, section 717(c), governing federal employment discrimination claims, does tie together initial recourse to the agency and subsequent recourse to a district court.[104]

The absence of precedent for skipping entirely over the "initial charge" requirement in federal sector cases is not surprising, for lower courts must heed the Supreme Court's admonition that section 717 "does not contemplate merely judicial relief. Rather, it provides for a careful blend of administrative and judicial enforcement powers." *Brown v. GSA, supra,* 425 U.S. at 833, 96 S.Ct. at 1968. Were we to embrace the futility or waiver arguments the Kizas complainants press and hold "unnecessary"[105] an initial charge filed with the

FBI, we would sanction erosion of "the carefully structured scheme for resolving charges of discrimination within federal agencies." *Porter v. Adams, supra,* 639 F.2d at 277.

### 2. The Manning initial charge

Shortly before the district court denied the Kizas complainants' motion for reconsideration of the Count II disposition, *see supra* note 93, counsel for the Kizas complainants discovered that a clerical employee adversely affected by the NSASS, Ronald B. Manning, had filed an initial charge with the FBI.[106] Several months after the Bureau's Equal Employment Opportunity Officer notified Manning that the FBI had rejected his complaint of race and sex discrimination,[107] Manning commenced a civil action challenging the NSASS. *Manning v. Webster,* No. 79–3429 (E.D.La. filed Sept. 5, 1979).[108] Manning's court complaint appears to be patterned on the Kizas amended complaint, filed more than six months earlier, on February 22, 1979. However, Manning did not seek to represent a class.[109] Apparently because Manning had independently filed suit in the court of his choice on his own behalf, the Kizas complainants successfully moved in the district court to sever Manning from their Count II class claim.[110]

---

**103.** Indeed, even before the Supreme Court's decision in *Zipes,* this court viewed Title VII's time provisions as subject to equitable modification. *See Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 474–75 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

**104.** For the full text of section 717(c), 42 U.S.C. § 2000e–16(c) (1976 & Supp. IV 1980), see *supra* note 100. In *Porter v. Adams, supra,* 639 F.2d at 276, the Fifth Circuit considered the matter and concluded: "The exhaustion requirement . . . is found in § 717(c) and is an absolute prerequisite to suit under that section." *But cf. supra* note 101.

**105.** Brief for Appellants at 24.

**106.** Manning's administrative complaint alleged that he was passed over in favor of less qualified applicants drawn from the women's and minorities' selection program. *See* Attachments to Memorandum to Court Addressing

New Evidence of Plaintiffs' Exhaustion of Administrative Remedies (filed Apr. 23, 1980), *reprinted in* I JA at 141, 148.

**107.** *Id.* at 145–46.

**108.** Manning initially requested a hearing before a complaints examiner, but withdrew the request a few weeks before he commenced his court action. *Id.* at 151.

**109.** On January 29, 1980, on joint motion of Manning and the Bureau, Manning's action was stayed pending either decertification of the class or final adjudication in the Kizas action. *Manning v. Webster, supra* (order staying proceedings), *reprinted in* I JA at 171.

**110.** The motion was made on October 23, 1980, and was granted by order filed November 19, 1980. District Court Civil Docket Sheet, *reprinted in* I JA at 1, 17.

██ The Kizas complainants assert that the FBI's disposition of Manning's charge shows that any similar charge they might have filed would have been unavailing. We find this hindsight justification inadequate to relieve the complainants before us of the charge-filing requirement. The alleged 1980 discovery that Manning had filed a charge does not explain or excuse the Kizas complainants' bypass of the agency in 1978, when they instituted this action, or in 1979, when they amended their complaint to add Count II.

██ The Kizas complainants further contend that Manning's charge should count for all members of the class they describe. They correctly observe that "[n]ot every member of a class need independently exhaust administrative remedies prior to seeking judicial relief." Brief for Appellants at 25; see *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 15 L.Ed.2d 280 (1975). This court has held that "where two plaintiffs allege that they were similarly situated and received the same discriminatory treatment, the purposes of the exhaustion requirement are adequately served if one plaintiff has filed an [administrative] complaint." *De Medina v. Reinhardt,* 686 F.2d 997, 1013 (D.C.Cir. 1982). While a Title VII plaintiff may thus escape the administrative charge-filing requirement by joining with an individual, similarly situated, who has filed a charge, *Foster v. Gueory,* 655 F.2d 1319, 1322 (D.C. Cir.1981), there is no such joinder in this case.

Manning was severed from the Count II class. Neither a named representative, nor any person purportedly represented by named parties is alleged to have observed the charge-filing requirement. No authority has come to our attention supporting the argument that named class representatives, having bypassed initial recourse to administrative relief, may bootstrap their class claim on the independently-filed charge of a similarly situated individual who subsequently pursues his own lawsuit in a different forum.

It is the general rule that initial pursuit of administrative relief by at least one class member is a prerequisite to the maintenance of a class action against a federal agency even in cases in which a charge-filing requirement comparable to Title VII's is not mandated. *See Phillips v. Klassen,* 502 F.2d 362, 369 (D.C.Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); *League of United Latin American Citizens v. Hampton,* 501 F.2d 843, 847 & n. 1 (D.C.Cir.1974); *Marrone v. INS,* 500 F.2d 418, 420 (2d Cir.1974) (per curiam). The Kizas complainants invite us to relax that minimal ("at least one") requirement in a Title VII case, an area in which the requirement has special force and importance. They do so by citing, belatedly, a charge filed by an individual who never purported to act on behalf of a class before the agency, moreover, one who has selected another judicial forum for pursuit of his individual employment discrimination claim. We would undermine both Title VII's initial charge-filing requirement for federal sector claims and appropriate limitations on class actions were we to accept the argument tendered.[111]

CONCLUSION

For the reasons stated, in Number 82–1477, we reverse the judgment for the employees on the "takings" claim and direct the district court to enter judgment for Webster *et al.;* in Number 82–1511, we

---

111. As a final argument, the Kizas complainants urge that even if they could not pursue Title VII relief in an independent action because they failed to file a charge with the FBI, the district court nevertheless should have decided their race and sex discrimination class claim as a matter "ancillary" to their Count I claim. The district court held that the exercise of ancillary jurisdiction would be "inappropriate" in this case. *Opinion II,* 492 F.Supp. at

1153; *see Morrow v. District of Columbia,* 417 F.2d 728, 740 (D.C.Cir.1969). That ruling is unquestionably correct. The concept of "ancillary" jurisdiction is not properly invoked to circumvent Title VII's firm charge-filing requirement for federal employees. Moreover, our disposition of the takings count leaves no principal action to which the discrimination count could be linked.

affirm the judgment dismissing the employees' discrimination claim.

*It is so ordered.*