**SENIOR EXECUTIVES ASSOCIATION, et al., Plaintiffs,**

v.

**UNITED STATES, et al., Defendants.**

**Civ. A. No. 80–2708.**

United States District Court, District of Columbia.

Dec. 15, 1983.

Bruce Terris, Philip Sunderland, Terris & Sunderland, Washington, D.C., for plaintiffs.

William H. Briggs, Jr., Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiffs, an association of federal employees most of whom are in the Senior Executive Service (SES), and six individual career appointees to the SES, brought this suit challenging the legality of statutory and regulatory restrictions which reduced the number of performance awards which federal agencies may issue to SES employees under 5 U.S.C. § 5384. The action also challenges restrictions imposed by the Office of Personnel Management (OPM) which reduced the number of incentive

awards agencies may issue pursuant to 5 U.S.C. § 4503. Plaintiffs seek a judgment awarding them the performance and incentive awards they were allegedly unlawfully denied in fiscal years 1980 and 1981 or, in the alternative, an order directing the defendants to require the agencies to reconsider the issuance of the awards without regard to the Congressional and OPM restrictions. Defendants have filed a motion to dismiss or for summary judgment, and plaintiffs have filed a cross motion for partial summary judgment. For the reasons stated below, defendants' motion will be granted.

## I

There is no genuine issue as to any material fact. In Title IV of the Civil Service Reform Act of 1978 (CSRA), Congress established the SES in order to afford federal agencies the flexibility needed to recruit and retain highly qualified executives for service in the higher management positions of the government.[1] Congress did not assign any federal employees to the new SES; instead, it offered employees serving in GS–16 through GS–18 level positions and those holding Executive Level IV and V positions the choice of either converting to the SES or remaining in the competitive or excepted civil service.[2] As an inducement to convert, Congress offered several bene-

fits to SES employees, including opportunities for increased compensation.[3]

Specifically, the statute authorized agency heads (1) to increase the basic rate of pay or salary of SES employees on the basis of their performance, 5 U.S.C. § 5383(c); (2) to recommended career appointees for the rank of Meritorious Executive for "sustained accomplishment" or the rank of Distinguished Executive for "sustained extraordinary accomplishment" and thereby to become eligible for lump sum payments of $10,000 or $20,000 respectively, 5 U.S.C. § 4507; and (3) to pay lump sum performance awards to SES career appointees whose performance rating was "fully successful" and who had been recommended for an award by a performance review board. 5 U.S.C. § 5384. With regard to the performance awards, the statute provided that the awards could not "exceed 20% of the career appointee's basic pay" and that the number of awards issued by an agency in a fiscal year could not exceed "50% of the number of [SES] positions in that agency." 5 U.S.C. § 5384(b)(3).[4] In its information publication of February 1979, OPM stated that "[o]n average, the typical competent executive can expect to receive a [performance award] about twice every three years."[5]

On July 13, 1979, the effective date of SES, 6,836 or 98.8 percent of the eligible

---

1. Congress indicated that, under the then existing system it was difficult for the federal government to reward executives whose work was outstanding and to reassign or remove those whose performance was unacceptable. By creating the SES, Congress intended to solve these problems and thereby to enable the federal agencies to recruit and develop executives of the highest quality. Legislative History of the CSRA, reprinted in 1978 U.S.Code & Ad.News at 2723, 2732.

2. In March 1979, OPM issued regulations establishing conversion procedures which required agencies to give written notice to all employees who were eligible to convert to the SES that they were "being offered an appointment under the Senior Executive Service." 5 C.F.R. § 317.-302(a)(1)(ii). The regulations also directed the agencies to notify their employees regarding the basic pay they would receive in the SES, the type of SES appointment they would receive, and of the 90 day time period in which they

could elect either to join the SES or remain under their current appointment system. § 317.302(a)(1)(ii) and (iv).

3. Other SES benefits included: (1) the opportunity to take sabbatical leave, 5 U.S.C. § 3396(c); (2) the ability to accumulate annual leave above the ceiling applicable elsewhere in the civil service, 5 U.S.C. § 6304(f); (3) executive development opportunities, 5 U.S.C. § 3396(a) & (b); (4) the assurance of GS–15 fallback in the event of a performance removal, 5 U.S.C. § 3594; and (5) non-competitive SES reinstatement if the executive left the SES, 5 U.S.C. § 3593(a).

4. This 50 percent limitation did not apply in the case of agencies which had fewer than four SES positions.

5. Plaintiffs' Exhibit J: "Senior Executive Service, Conversion Information for Federal Executives" at p. 17.

federal employees decided to convert, and over 6,300 of these joined the SES as career appointees. The decision to convert was not rescindable.

Approximately one year later, Congress reduced the percentage limitation on the number of SES performance awards an agency could issue from 50 percent to 25 percent. Section 303 of the Supplemental Appropriation Act of 1980, Pub.L. 96–304, 94 Stat. 857 (July 24, 1980).[6] Thereafter, OPM, which was assigned the responsibility for implementing the SES, issued a memorandum to heads of departments and agencies advising them to limit bonuses to 20 percent of the eligible career employees.[7] OPM elaborated that "[i]f the agency head feels a higher proportion is essential, he or she must consult with the Director of OPM." Finally, OPM established guidelines to aid agencies in deciding the amount of the bonus to be paid.[8]

In a second memorandum to heads of departments and agencies, OPM stated that agencies must not use incentive awards to circumvent the statutory restriction or OPM ˙ guidelines concerning the number and distribution of performance awards.[9]

Plaintiffs allege that they had constitutionally protected property and contractual rights in the performance award system established by section 5384, including the right to compete in fiscal years 1980 and 1981 for performance awards numbering

up to as many as 50 percent of an agency's SES positions, and that the limitations imposed by Congress and the OPM infringed these rights in violation of the Fifth Amendment. In response, defendants argue that (1) plaintiffs lack standing to sue because their claim of injury is too speculative; (2) plaintiffs have no vested property right or implied contractual right in the SES bonus provisions to invoke the protections of the Fifth Amendment; and (3) OPM's further limitations on the number of SES performance awards and incentive awards an agency should issue was merely guidance, and therefore did not directly affect any of plaintiffs' rights. The Court will address these issues *seriatim*.

## II

■■ One aspect of the constitutional requirement of a "case or controversy" is that plaintiff must have standing to sue. At a minimum, a party who invokes the court's jurisdiction must show that he personally suffered some actual or threatened injury as a result of the alleged illegal conduct and that the injury can fairly be traced to the challenged conduct and is likely to be redressed by a favorable decision. *Valley Forge College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Gladstone Realty v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66

**6.** That limitation applied to fiscal year 1980. Congress continued the reduced percentage limitations for fiscal years 1981 through 1982. See House Joint Resolution 610, Pub.L. 96–369, 94 Stat. 1352 (Oct. 1, 1980) and H.J.Res. 644, Pŭb.L. 96–536. In fiscal year 1983, Congress further reduced the percentage limitation to 20 percent. Pub.L. 97–276, § 101(e), 96 Stat. 1189 (Oct. 2, 1982).

**7.** OPM Memorandum of July 21, 1980, p. 1.

**8.** Under the proposed schedule, OPM suggested that bonuses of 20 percent be limited to no more than five percent of those receiving bonuses; bonuses of 17–20 percent be limited to no more than 10 percent of the recipients; and bonuses of 12–20 percent be limited to no more than 25 percent of the recipients. OPM stated that these limits were to apply to agencies with 100 or more career senior executives and al-

though they could not be rigidly applied in small agencies they should be considered as general guidelines. July 21, 1981 memo at p. 1.

**9.** OPM cited the use of incentive awards for sustained superior performance under 5 U.S.C. chapter 45 to reward SES members. Because it regarded these awards as analogous to performance bonuses under 5 U.S.C. chapter 54, the agency stated that only the latter could be used to reward SES members for sustained superior performance. OPM noted, however that

[a]gencies ... may continue to use incentive awards to recognize a specific one-time accomplishment, a suggestion, an invention or a scientific achievement made by a senior executive.

OPM memo of July 24, 1980 at p. 1.

(1979); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976). Defendants argue that, because the award of bonuses was left to the discretion of the agency heads, plaintiffs have failed to show that they suffered any "injury in fact" when Congress and OPM subsequently reduced the number of possible awards.

According to the defendants, the government never guaranteed plaintiffs that they would receive SES bonuses even if they were among those employees recommended by their supervisor or their agency's Performance Review Board.[10] From this, defendants deduce that plaintiffs' alleged injury is too remote and too speculative to establish standing; that plaintiffs have failed to show that their alleged loss of bonuses is causally connected to the percentage limitations imposed by Congress and OPM; and that in any event, it has not been shown that the alleged injury—the diminished opportunity to compete—would be remedied by the relief requested.

■ In ruling on a motion to dismiss for want of standing, the Court must accept as true all material allegations of the complaint, and it must construe the complaint in favor of the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). On the basis of this standard, the Court finds that plaintiffs have alleged facts from which it could reasonably be inferred (1) that absent the limi-

tations imposed by Congress and OPM, there is a substantial probability that the agencies would have awarded more bonuses to plaintiffs that were actually granted, and (2) that if the Court affords the relief requested, there is a substantial likelihood that at least some of the plaintiffs may receive awards for fiscal years 1980 and 1981.[11] *Warth v. Seldin, supra,* 422 U.S. at 504, 95 S.Ct. at 2208.

■ To be sure, plaintiffs cannot demonstrate an absolute right to receive performance awards. But that is not necessary for standing purposes. The alleged injury to their right to compete for a discretionary award is sufficient injury to confer standing.[12] According to the complaint based on defendants' allegedly unconstitutional restrictions, the federal agencies cut back substantially on the number of performance awards actually issued,[13] and at least some of the plaintiffs did not receive performance awards they would otherwise have obtained.[14] These allegations, in the view of the Court, provide a causal connection between the challenged conduct of defendants and plaintiffs' injury sufficient for standing purposes. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 42–43, 96 S.Ct. 1917, 1926–27, 48 L.Ed.2d 450 (1976).

### III

■ It is well settled that a constitutionally protected property right exists only

---

10. Under the statute, the agency head was free to give no awards.

11. The Court also assumes, for purposes of resolving the standing issue, that the congressional and OPM percentage limitations constitute an unconstitutional taking violative of the Fifth Amendment.

12. See *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) (disappointed bidder in government contract case has standing to challenge the validity of agency's award).

13. Prior to the limitations, two agencies with over 25 SES employees made awards: the SBA made awards to 28.3 percent of its SES positions and 48.4 percent of its career employees; and NASA made awards to 46.2 percent of its SES positions and 53.3 percent of its career

appointees. After the limitations became effective, only two of the 32 agencies which issued awards, issued them to more than 25 percent of their eligible employees. Thirteen of those 31 agencies issued awards to between 20 and 25 percent of their eligible employees and 16 issued awards to fewer than 20 percent of their eligible employees. Only two of the agencies issued awards to more than 20 percent of their SES positions. Plaintiffs' memorandum at p. 67.

14. In fact, several agencies have conceded that they restricted the number of performance awards recommended by supervisors or Performance Review Boards in order to comply with the congressional and OPM limitations.

when the person claiming such a right has a "legitimate claim of entitlement." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Moreover, in the case of government benefits, an entitlement is determined by a review of the applicable statute or regulation. Plaintiffs concede that SES employees do not have a Fifth Amendment property right to, and are not entitled to receive, performance awards. Rather they claim that SES employees have a constitutionally protected property interest in competing for performance awards which may number as many as 50 percent of their agency's SES positions.[15]

In the view of the Court, the existence of a mere opportunity to compete for awards numbering up to 50 percent of the agency's SES positions did not create a vested prop-erty in plaintiffs which the federal government could not defeat, for the following reasons.[16]

First. Plaintiffs argue that the opportunity to compete for performance awards numbering up to 50 percent of their agencies' SES positions was a vested form of deferred compensation guaranteed them by their employment contracts with the federal government. Plaintiffs argue that the language of the statute and the OPM representations,[17] promising them this opportunity to compete constituted consideration for their conversion to SES positions, and that they gave consideration on their part by accepting SES positions and giving up substantial rights and benefits associated with their civil service positions.[18] Because these representations, plaintiffs' alleged reliance, and the mutual exchange of benefits

---

**15.** This is based on the proposition that, by accepting the government's offer to convert to the SES, they derived a property right to compete in each year of their SES service, or at the very least that, by completing all or substantially all of their initial SES appraisal cycle before Congress imposed its limitation, they had a right to compete for awards during their first appraisal cycle.

**16.** Before the right to receive a performance award can vest, the employee must be an SES appointee with a performance rating of fully successful or better and be recommended for an award by a supervisor or Performance Review Board, and the employee must then be chosen for such an award by the agency head. However, even after an agency head decides to give an award to a particular employee, the bonus disbursement may be interrupted by a congressional action. See, *e.g., AFGE v. Campbell,* 659 F.2d 157, 163 (D.C.Cir.1980), where the court held that congressional appropriations bill could effectively and legally amend the prevailing rate statute by establishing a 5.5 percent pay cap on federal wages.

**17.** Plaintiffs allege that in presenting the SES conversion option to eligible federal employees, OPM represented that (1) SES employees would be eligible to compete for performance awards which could number up to 50 percent of their agencies' SES positions; (2) SES employees could actually expect to be eligible for performance awards numbering up to two-thirds of their agencies' SES career appointees; (3) competent SES career appointees could expect to receive a performance award twice every year; and (4) performance awards would not be sub-ject to any congressional pay ceiling. Plaintiffs admit that in making these representations, OPM accurately explained what was the then current law. Plaintiffs' Statement of Material Facts, 5 and 6.

**18.** Among the rights and benefits allegedly relinquished are the following:

(1) SES employees may be removed from the SES or reassigned within their agency on the basis of poor performance ratings. § 4314(b)(3) and (4), whereas non-SES employees may be removed only for cause. 5 U.S.C. § 7513(a).

(2) SES employees have no right to challenge poor performance ratings, 5 U.S.C. §§ 7542, 7543, and 7703(a) unless they are removed, in which case they may request an informal hearing before an official designated by the Merit System Protection Board. 5 U.S.C. § 3592(a).

(3) SES employees have no right to regular step increases based upon time in grade, 5 U.S.C. § 5335, and while their salaries may be increased based on performance, they may also be decreased based on poor performance. 5 U.S.C. § 5383(d). Moreover, any such reduction does not constitute an adverse action and is therefore not appealable.

(4) SES employees have no right to veterans preference in the case of a reduction of force, 5 U.S.C. §§ 2108(5) and 3501(b).

(5) SES employees may be reassigned without cause to other SES positions within their agency regardless of geographic location and regardless of any change in authority, responsibility, and status. 5 U.S.C. § 3395(a)(2) and 7542. Such a reassignment is not appealable. 5 U.S.C. § 7543(d).

contain all the elements of an implied in fact contract or promissory estoppel, plaintiffs argue that their right to compete for performance awards numbering up to 50 percent of an agency's SES position protected by the Fifth Amendment.

Although this contention might have merit in the context of private employment, it is not relevant here. In *Kizas v. Webster*, 707 F.2d 524 (D.C.Cir.1983), a case which is close on the governing facts to this case, FBI clerical and support employees had challenged the Bureau's modification of a program which provided preferential consideration to plaintiffs for jobs as special agents. The plaintiffs there argued that their expectation of special consideration was a property interest which could not be unilaterally revoked without compensation or procedures as required by the Fifth Amendment. In support of this argument, they suggested that the preference was an element of deferred compensation "due and owing them," and further that their legitimate expectations in receiving the preference was an indefeasible property right protected by the due process clause. The Court of Appeals rejected both arguments and held that the employees had no vested rights in the former special preference. With respect to the issue here under consideration, the Court noted, quoting *Kania v. United States*, 650 F.2d 264, 268, 227 Ct.Cl. 458 (1981) that

> [F]ederal employees serve by appointment, and their rights are therefore a matter of "legal status even where compacts are made." [19]

In short, any entitlement plaintiffs have to pay and other benefits, including the opportunity to compete for performance awards, is determined by statutes and regulations, rather than by ordinary contract principles. *United States v. Larinoff*, 431 U.S. 864, 869, 97 S.Ct. 2150, 2154, 53 L.Ed.2d 48 (1977); *Riplinger v. United States*, 695 F.2d 1163, 1164 (9th Cir.1983).

It also follows that any representations by OPM [20] or the agencies did not create enforceable property rights. This is so regardless of whether plaintiffs gave consideration for or detrimentally relied on these assurances. *Kizas v. Webster*, 707 F.2d at 535–36.[21]

Second. Plaintiffs argue that they have an indefeasible property right in the opportunity to compete for awards numbering up to 50 percent of the agencies' SES positions. Again, as was the case of the plaintiffs in *Kizas v. Webster, supra*, plaintiffs here confuse the two separate "property interests" which are protected by the two separate clauses of the Fifth Amendment. For purposes of procedural due process guarantees, a person has a property interest in a governmentally conferred benefit if he has a "legitimate claim of entitlement" to the benefit. *Kizas v. Webster, supra*, 707 F.2d at 539.[22] This legitimate claim of entitlement does not, however, always rise to the level of "property" protected by the takings clause of the Fifth Amendment.

"The fifth amendment employs two independent clauses to address two independent issues. A claim of *deprivation*

---

**19.** A federal employee's claim, which is founded on contract principles are "moral, not legal." *Shaw v. United States*, 640 F.2d 1254, 1260, 226 Ct.Cl. 240 (1981).

**20.** In its informational publication, OPM stated that "[o]n the average, the typical competent executive can expect to receive a bonus about twice every three years." Plaintiffs' Exhibit J.

**21.** See, *e.g., Riplinger v. United States, supra* (federal employees could not rely on promises of government officials that they would be appointed to a particular grade or step, and were entitled only to salary of the appointed positions they actually received); *National Treasury Em-*

*ployees Union v. Reagan*, 663 F.2d 239, 245–46 (D.C.Cir.1981) (federal government assured plaintiffs jobs and later, after the prospective employees had acted in reliance on those job offers, the government revoked the offers).

**22.** Where such a property interest exists, and an individuals' entitlement turns upon material questions of disputed fact, the due process clause guarantees minimum procedural protections, typically notice and an opportunity for a hearing. *Id.* See also *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

of property without due process of law cannot be blended as one and the same with the claim that property has been taken for public use without just compensation." A "legitimate claim of entitlement" to a government benefit does not transform the benefit *itself* into a vest right. Rather, due process "property interests" in public benefits are "limited, as a general rule, by the governmental power to remove, through prescribed procedures, the *underlying source of those benefits."*

*Id.* (footnotes omitted).

While Congress did provide in section 5384 of the CSRA that agencies could make performance awards up to 50 percent of the number of their SES positions, it amended this section in the appropriations bill of 1980 by reducing the percentage limitation to 25 percent. In *AFGE v. Campbell,* 659 F.2d 157 (D.C.Cir.1980), the court held that an appropriations bill could effectively and validly amend the prevailing rate statute covering employees to provide that their wages could not be increased by more than 5.5 percent for fiscal year 1979.[23] As in the *Campbell* case, plaintiffs have no vested right to be con-

sidered for performance awards numbering up to 50 percent of their agencies' SES positions since the appropriations bill reducing the percentage limitation to 25 percent was signed into law before plaintiffs were considered for and the agencies issued performance awards.[24]

 To be sure, plaintiffs may have had an expectation that they would be considered for performance awards under the 50 percent limitation provided in § 5384(b), and it may also be that this expectation was reasonable given the statutory language and agency action prior to the passage of the appropriations bill.[25] But a reasonable expectation does not constitute a property interest[26] nor does a legitimate claim of entitlement to a government benefit transform the benefit itself into a vested property right.[27]

 The Court holds that, since an individual plaintiff's right to be considered for a performance award vested only when the head of the agency or department actually decided to make such an award and took whatever steps were necessary to carry out this decision, there was no unconstitutional taking. If particular plaintiffs had arbi-

**23.** The agencies, pursuant to the statutory provisions governing the establishment and adjustment of appropriate wage schedules and rates for prevailing rate employees, recommended wage increases of between 7 and 12 percent. Because the agencies anticipated the passage of the appropriations bill establishing the pay cap of 5.5 percent, they did not issue the orders necessary to implement the increases before the bill was signed into law. Plaintiffs sued to enforce their alleged rights to wage increases based solely on the wage surveys under the prevailing rate statute. The Court rejected plaintiffs' claim because it found that they did not have a vested statutory right to any wage increases until their agencies issued orders granting increases, and that no such orders were issued until after the passage of the limiting appropriations bill. 659 F.2d at 159-60.

**24.** See also, *American Postal Workers Union v. United States,* 707 F.2d 548, 554 (D.C.Cir.1983) (because none of the plaintiffs had applied for retirement benefits by the effective date of the change, no plaintiff had a right to begin receiving an annuity on that date and thus no plaintiff had a protected property interest in benefits calculated using the Pre-1978 method).

**25.** Only two agencies issued performance awards prior to the passage of the Appropriations Bill of 1980. The SBA made 15 awards representing 28.3 percent of its SES positions and 48.4 percent of its SES career appointees. NASA made 240 awards representing 46.2 percent of its SES positions and 53.3 percent of its SES career appointees.

**26.** *American Postal Workers Union v. United States Postal Service, supra,* 707 F.2d at 554.

**27.** See *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), in which the Supreme Court emphasized the difference between entitlements and indefeasible rights. The Court held that welfare recipients did not possess an indefeasible property right that could not be divested by benefit-offset provisions of the Social Security Act. Moreover, "the analogy drawn in *Goldberg* between social welfare and 'property' ... cannot be stretched to impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits." 404 U.S. at 81, 92 S.Ct. at 257.

trarily been denied the opportunity to compete for performance awards, their claim of an entitlement to compete for awards numbering up to 50 percent might have guaranteed them minimum procedural safeguards. Here, however, the underlying entitlement—the right to compete for performance awards numbering up to 50 percent of the agencies' SES positions—was itself modified.

Plaintiffs' right to compete for performance awards can be determined only by reference to the statute or regulations in effect at the time the agencies actually made their decisions. Congress could have eliminated the performance awards provision altogether and the Court, under the decisions, would have been obliged to uphold such an action. "Public benefits are not held in fee simple." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 796, 798, 100 S.Ct. 2467, 2481, 2482, 65 L.Ed.2d 506 (1980) (Blackmun, J., concurring in the judgment). It follows that Congress could legally decide, as it did, to reduce the possible number of performance awards an agency might issue.

**28.** The memorandum dated July 21, 1980 from the Director of OPM, provides in pertinent part:

Agencies are limited in payment bonuses to maximum of 25 percent of SES positions. Congress has made it clear that the 25 percent figure is to be a limit, not the norm. Agencies should generally limit bonuses to 20 percent of the eligible career employees. If the agency head feels a higher proportion is essential, he or she must consult with the Director of OPM.

**29.** Memorandum of July 24, 1980, to Heads of Department and Agencies. The Director of OPM informed agency heads that:

To carry out the congressional intent, agencies must not use incentive awards to circumvent either the statutory language or OPM's guidance of July 21, 1980, concerning the number and distribution of awards. An incentive award for sustained superior performance under 5 U.S.C. Chapter 45 is analogous to an SES performance bonus under 5 U.S.C. Chapter 54. Thus, agencies may not use incentive awards to reward sustained superior performance by SES members.

Agencies, however, may continue to use incentive awards to recognize a specific one-time accomplishment, a suggestion, an invention or a scientific achievement made by a senior executive. Agency heads should re-

## IV

■ Plaintiffs also challenge OPM's further limitations on the number of performance awards for which SES appointees could compete. These limitations appeared in two OPM memoranda directing heads of agencies and departments (1) to limit the number of performance awards to only 20 percent of their "eligible career employees"[28] and (2) to curtail the use of incentive awards under 5 U.S.C. § 4503 as performance award substitutes.[29] Plaintiffs allege that these limitations are invalid because they are inconsistent with the statutory provisions upon which they purportedly rely.[30]

The Court finds that the OPM limitations are not invalid under the statute. That fact that OPM recommended that fewer performance awards be issued than permitted under section 5384 as amended by the appropriations bill of 1980 does not render the limitations invalid as a matter of law. Congress specifically authorized the OPM to issue guidance[31] to agencies in implementing the performance award program:

view personally all awards to ensure that the type of award is appropriate and that the individual SES member is deserving recognition.

**30.** Specifically, plaintiffs argue that OPM improperly imposed a 20 percent limitation although Congress authorized awards up to 25 percent of the agencies' SES positions; that OPM based the number of performance awards which an agency may issue on its SES "career employees" rather than its SES "positions"; and that the limitation on the use of incentive awards to award SES employees for superior performance was directly contrary to section 4503 which authorizes agencies to issue these awards to SES employees.

Plaintiffs also argue that the OPM limitations are constitutionally invalid under the Fifth Amendment. This claim fails for the same reasons the Court rejected plaintiffs allegations that the Congressional limitation upon performance awards was unconstitutional. See pp. 9–17, *supra*.

**31.** Defendants contend that the OPM memoranda recommending that agencies limit bonuses to 20 percent of their career appointees as well as advising agencies not to use incentive awards to circumvent the Congressional and OPM limita-

The Office of Personnel Management may issue guidance to agencies concerning the proportion of Senior Executive Service salary expenses that may be appropriately applied to payment of performance awards and the distribution of awards.

5 U.S.C. § 5384(d). In another section Congress again directed OPM to prescribe such regulations as it deemed necessary in order to carry out the purposes of the provisions governing pay for the SES. 5 U.S.C. § 5385. It is pursuant to its oversight responsibilities that OPM circulated the memoranda challenged by plaintiffs. The Court concludes not only that were the OPM memoranda authorized by Congress, but also that the guidance contained therein was not inconsistent with the statutory language and the Congressional intent.

The 25 percent maximum authorized by Congress was clearly meant to be an outer limit on the number of awards an agency could issue, not a goal to be achieved. In

reporting the Supplemental Appropriations Act of 1980, the Conference Committee stated that, in light of "reports that an excessive number of SES employees are being designated to receive bonuses,[32] and that bonuses are being denied to all other senior appointed and elected officials of the government," it was providing that "no more than 25 percent of the number of Senior Executive Service positions ... may receive performance awards" for fiscal year 1980. H.Rep. 96–1149, 96th Cong., 2d Sess. 68 (1980). Moreover, three Senators who were key members of the Appropriations Committee and who participated in the decision to impose the 25 percent limit, advised the Director of OPM that agencies should take a cautious approach in implementing the awards program.[33] Although this letter does not qualify as "legislative history," it is evidence of the concerns facing Congress when the appropriations bill was passed.[34] In light of these Congres-

tions were merely "cautious guidance" and therefore not reviewable by the Court. However, even if the OPM memoranda were guidance rather than mandatory requirements as plaintiffs maintain, the Court would still have jurisdiction (see *Continental Airlines, Inc. v. CAB*, 522 F.2d 107, 124 (D.C.Cir.1974); *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33 (D.C.Cir. 1974); *Citizens Communications Center v. FCC*, 447 F.2d 1201 (D.C.Cir.1971)) particularly here, where plaintiffs allege that the rule or policy has been actually implemented.

**32.** Only two agencies had issued performance awards before Congress passed the Appropriations Bill. The SBA, in April 1980, issued 15 performance awards, representing 28.3 percent of its SES positions and 48.4 percent of its career appointees. In May 1980, NASA issued 240 awards representing 46.2 percent of its SES positions and 53.3 percent of its career appointees. Plaintiffs' Exhibit G.

**33.** In a letter to Mr. Alan K. Campbell, then Director of OPM, dated July 2, 1980, Senators Eagleton, Magnuson, and Sasser stated:

As you probably have learned, the whole Senior Executive Service concept almost went "down the tubes" last night in the House-Senate Conference on the FY '80 Supplemental. It was the very last matter resolved in the early, early morning hours.

The House Conferees were furious at the way NASA had prostituted the SES concept. We finally agreed on a 25% maximum without a cap.

If several of the agencies come in at 25% or 24.9% or 24.8% or anything like that indicating a disregard for the SES concept as previously demonstrated by NASA, then I predict that you can 'kiss SES goodby.'

For God's sake, see to it that good judgment is used in this matter.

Senator Magnuson was Chairman of the Appropriations Committee; Senator Eagleton was a member of the Committees on Appropriations and Governmental Affairs; and Senator Sasser was a member of the Committee on Appropriations and of the Civil Service and General Services Subcommittee of the Governmental Affairs Committee.

**34.** Plaintiffs argue that if OPM was influenced by the Senators' letter, its more restrictive limitations must be invalidated, relying on *Sierra Club v. Costle*, 657 F.2d 298 (D.C.Cir.1981), in which EPA regulations were challenged on the basis of alleged congressional pressure. The court, which ultimately upheld the regulations, stated that before it could overturn an administrative rulemaking on this ground, two conditions must be met:

First, the content of the pressure upon the Secretary [must be] designed to force him to decide upon factors not made relevant by Congress in the applicable statute. . . . Second, the Secretary's determination must be affected by those extraneous considerations. 657 F.2d at 409. There is some question whether this doctrine applies at all in the context of

sional actions, the Court finds that OPM's advice to agencies to employ a conservative and cautious approach in issuing performance and incentive awards to SES employees was reasonable. Accordingly, the OPM limitations will likewise be upheld.

## V

The Court obviously lacks the authority to review the wisdom of congressional decisions to reduce the number of places available for performance awards or bonuses. It may be that the Congress felt that the new system had been abused in certain departments or agencies and that only an across-the-board reduction could solve the problem these abuses had created. See notes 32 and 33 *supra.* In any event, it is settled law that no contractual or property rights accrue from a mere expectation of civil service-type benefits; Congress, because of its power over legislation and over the purse, has the power at any time to extinguish those expectations unless they have actually vested. No vesting had occurred here.

This conclusion is supported also by practical considerations. If it were to be held that, as a matter of constitutional law, plaintiffs now possess an indefeasible property right to compete for awards numbering up to fifty percent of the agencies' SES positions, it would follow that Congress could never reduce this inchoate benefit to any federal employee by a subsequent change in the law. This theory—that Congress may increase civil service benefits but that it is prevented by a ratchet-like mechanism inherent in the Constitution from ever reducing them—makes no sense. The action will accordingly be dismissed.

---

this case since the challenged administrative action is not a rule subject to the requirements of notice and an opportunity to comment. In any event, plaintiffs' claim must be rejected because the first criterion of the test has not been met. As discussed above, the content of the letter sent to the Director of OPM merely described, albeit in stronger language, the reasons why Congress decided to reduce the percentage limitations. Accordingly, to the extent that the Director of OPM did rely on this letter, the content of the letter was appropriately relevant.